# United States Court of Appeals
## For the First Circuit

No. 02-2326

BRIAN COCHRAN,

Plaintiff, Appellant,

v.

QUEST SOFTWARE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Selya and Lynch, Circuit Judges,

and Young,* District Judge.

Gaetano J. DeLuca for appellant.
Laurence J. Donoghue, with whom Morgan, Brown & Joy, LLP was on brief, for appellee.

April 29, 2003

_____
*Of the District of Massachusetts, sitting by designation.

**SELYA**, **Circuit Judge**. Plaintiff-appellant Brian Cochran sued his quondam employer, defendant-appellee Quest Software, Inc. (Quest), claiming, inter alia, (1) that Quest's wrongful termination of his employment caused him to lose the benefit of valuable but unvested stock options; (2) that, prior to his firing, Quest unlawfully rescinded some stock options; and (3) that Quest shortchanged him in calculating the amount of options that had vested before his employment ended. The district court wrote a thoughtful rescript and granted summary judgment in the defendant's favor. Cochran v. Quest Software, Inc., 2002 U.S. Dist. LEXIS 16204 (D. Mass. Aug. 19, 2002). Cochran appeals. We affirm.

## I.  BACKGROUND

In accordance with the settled praxis for appellate review of summary judgments, see, e.g., Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000), we rehearse the facts in the light most favorable to the summary judgment loser (here, the plaintiff).

In early 1999, the plaintiff learned that the defendant was expanding its sales force. He began to explore possible opportunities and, on February 25, 1999, the defendant offered him a position as a regional sales manager. The offer letter outlined the proposed duties, scope of responsibility, emoluments, and the like. The compensation package included a proposed grant of options for 60,000 shares of Quest stock "with the standard vesting

-2-

schedule." That phraseology permitted the plan administrator to impose a vesting schedule not "more restrictive than twenty percent per year vesting, with initial vesting to occur not later than one year after the issuance date."

The plaintiff accepted the offer on March 2, 1999, and began his new job a week later. At that time, the plaintiff signed an acknowledgment indicating that he had received, and understood, the employee handbook. Among other things, the acknowledgment form provided:

> I understand and agree that employment with Quest Software is not for a specified term and is at the mutual consent of both Quest Software and me. Either [Quest] or I can terminate the employment relationship at-will, with or without reason, at any time.

On November 30, 1999, the defendant's stock split three-for-two. This resulted in an increase in the plaintiff's options from 60,000 to 90,000 shares, and a proportionate decrease in the exercise price. At around the same time, the defendant furnished the plaintiff with a vesting schedule and the plaintiff signed a document assenting to it. The schedule indicated that twenty percent of the options would vest on April 1, 2000 — all along, the parties have assumed this to be the one-year anniversary date, and we indulge that assumption — and an additional thirteen percent would vest every six months thereafter for the next two and one-half years. The remainder of the options would vest on April 1,

2003. All vesting was contingent on the plaintiff's continued employment.

The employment relationship did not go smoothly. In January of 2000, the plaintiff met with his immediate superior, Douglas Garn, who expressed disappointment in his performance. Garn told the plaintiff that the defendant might well recall some of his stock options. On March 23, 2000, this prediction became a reality; the plan administrator sent the plaintiff a written notice that his unvested options had been reduced by 27,500 shares. On March 27, 2000, the plaintiff signed a form acknowledging this change. It is important to note that the reduction occurred before any of the options had vested and left the plaintiff with options for 62,500 shares.

On March 31, 2000, Quest stock split two-for-one. This split doubled the number of shares subject to the stock options and further reduced the exercise price. The next day, the plaintiff reached the first vesting milestone. Twenty percent of his options, covering 25,002 shares, vested at that time.[1] He continued to work for the defendant until July 10, 2000, when he was cashiered. He neither asked for nor received a specific reason

---

[1]The vesting schedule, as supplemented by the parties' specific agreements, called for the vesting of not less than twenty percent of the optioned shares on April 1, 2000. See text supra. Under the circumstances, this amounted to a minimum of 25,000 shares. In point of fact, the plan administrator allotted an extra two shares to the plaintiff. The parties attach no significance to this slight variance, so we ignore it.

for his termination.  Subsequently, he exercised the vested portion of his stock options, buying 25,002 shares at a bargain price of $1.19 per share and immediately reselling them for $55 per share. His remaining stock options lapsed upon the cessation of his employment.

Dissatisfied with his treatment, the plaintiff sued in a Massachusetts state court seeking to enforce the remainder of his stock options or, in the alternative, to recover damages.  Citing diversity of citizenship and the existence of a controversy in the requisite amount, the defendant removed the action to the United States District Court for the District of Massachusetts.  See 28 U.S.C. §§ 1332(a), 1441.  After the completion of pretrial discovery, the parties cross-moved for summary judgment.

The district court granted the defendant's motion and denied the plaintiff's counterpart motion.  The court determined that the plaintiff was an at-will employee subject to termination at any time; that the stock options vested periodically (contingent on future employment); and that the defendant had the right to cancel the unvested stock options upon the plaintiff's discharge. Cochran, 2002 U.S. Dist. LEXIS 16204, at *22-*23.  The court also upheld the partial rescission that had occurred in March of 2000, concluding that the parties had entered into a mutually agreed modification of the employment agreement and that the plaintiff's continued employment constituted valid consideration for this

-5-

modification. Id. at *23. Thus, the plaintiff held vested options for only 25,002 shares upon his ouster. Id. at *6.

The plaintiff moved for reconsideration, asking the district court to reexamine its determination anent consideration and to recalculate the number of shares that had vested on April 1, 2000. The court summarily denied the motion. This appeal ensued.

## II.  STANDARD OF REVIEW

This court reviews grants of summary judgment de novo. See Plumley v. S. Container, Inc., 303 F.3d 364, 369 (1st Cir. 2002); Suarez, 229 F.3d at 53. We decide for ourselves whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution might affect the outcome of the case under the controlling law. United States v. One Parcel of Real Property (New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992). A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way. Id.

In conducting this canvass of the record, we must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir.

-6-

1990). This does not mean, however, that we must swallow the predicate for the nonmovant's opposition hook, line, and sinker; among other things, we safely may ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). This framework is not altered by the presence of cross-motions for summary judgment. See Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) (explaining that the court must mull each motion separately, drawing inferences against each movant in turn).

## III. DISCUSSION

We now turn to the merits of the plaintiff's asseverational array. Refined to bare essence, he makes three arguments. First, he charges that the defendant wrongfully terminated his employment. Second, he alleges that, prior to his dismissal, the defendant illegally rescinded some of his stock options. Finally, he challenges the district court's computation of the number of options that had vested before he was handed his walking papers. We address each argument in turn.

As a threshold matter, though, we first must determine what law to apply. It is elementary that a federal court sitting in diversity jurisdiction must borrow the substantive law of the forum state. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). The forum state's choice-of-law tenets are part of its substantive law, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97

(1941), and Massachusetts courts generally apply the law of the state that has the most significant relationship to the litigation. See Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 668-69 (Mass. 1985).

In this instance, we need not undertake an archeological dig to locate the case's center of gravity. It is settled in this circuit that when the parties have reached a plausible agreement about what law governs, a federal court sitting in diversity jurisdiction is free to forgo independent inquiry and accept that agreement. See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991). Thus, we follow the parties' lead and apply the substantive law of Massachusetts.

## A. **Wrongful Termination**.

The plaintiff's wrongful termination claim rests initially on the premise that he was not an at-will employee, but, rather, an employee for a term of years. In his view, a definite term of employment can — and should — be implied from the text of the offer letter. This is wishful thinking.

The plaintiff's argument begins with a statement in the offer letter granting him options for 60,000 shares of stock "with the standard vesting schedule." Building on this meager foundation, he argues that the defendant's standard vesting schedule contemplated vesting over several years, and that, therefore, this language shows an intention to employ the plaintiff

for a definite term of years, that is, throughout the multi-year vesting period.

This construct is unpersuasive. First and foremost, it disregards the express language of the offer letter, which included an explicit statement that, if the offer were accepted and the plaintiff became an employee, the defendant thereafter "may terminate [the plaintiff's] employment at any time with or without cause." It also disregards the fact that the offer letter described the defendant as an "At Will" employer. The stock option agreement, executed ancillary to the plaintiff's acceptance of the offer, made the same point in a more baroque fashion. It provided:

> Nothing in the Plan shall confer upon [an employee] any right to continue in service for any period of specific duration or interfere with or otherwise restrict in any way the rights of [Quest] . . . to terminate such person's service at any time for any reason, with or without cause. [Excess capitalization omitted.]

If more were needed, the employee handbook contained numerous statements to the effect that all of Quest's employment relationships were at-will. The plaintiff signed an acknowledgment indicating both that he received a copy of this handbook when he started with the defendant and that he understood its admonitions. This acknowledgment specifically noted the plaintiff's understanding that "employment with Quest Software is not for a specified term and is at the mutual consent of both Quest Software and [the employee]."

In Massachusetts, as elsewhere, the terms of an employment agreement must be deduced, construed, and enforced as written. In the course of that endeavor, courts may not single out an isolated word or phrase at the expense of the language as a whole. Here, the plaintiff's contract contains not the slightest hint of ambiguity as to the duration of the employment.[2] The same is true of the stock option agreement. The employee handbook seals the deal. See Jackson v. Action for Boston Cmty. Dev., Inc., 525 N.E.2d 411, 415 (Mass. 1988) (concluding that continuing employment after receiving an employee manual can suffice to incorporate the manual's terms into the employment contract). So viewed, the interpretive task is uncomplicated: the plaintiff was an at-will employee, and the defendant had an unfettered right to discharge him. See id. at 412; Cort v. Bristol-Myers Co., 431 N.E.2d 908, 911 (Mass. 1982); Fenton v. Fed. St. Bldg. Trust, 39 N.E.2d 414, 415 (Mass. 1942).

---

[2] The plaintiff relies on Presto v. Sequoia Sys., Inc., 633 F. Supp. 1117 (D. Mass. 1986), to support his claim that an offer of stock options vesting over a period of time necessarily creates a contract for a term of years. This reliance is mislaid. The court there was addressing a motion for dismissal under Fed. R. Civ. P. 12(b)(6). See id. at 1118. The standards applicable at the summary judgment stage are far more demanding. Compare, e.g., Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002) (articulating standard under Rule 12(b)(6)), with, e.g., Plumley, 303 F.3d at 368-69 (articulating standard under Rule 56(c)). Moreover, the documents at issue in Presto lacked the express and repeated references to at-will employment that permeate the record in this case.

The plaintiff has a fallback position on this issue. He contends that the termination of his employment was wrongful because the firing prevented the vesting of his remaining stock options. This contention requires us to consider a narrow exception that Massachusetts courts have carved to the rule that an employer may jettison an at-will employee any time and for any reason, without incurring liability for damages.

The exception applies to cases in which an ousted employee can show that the termination of his employment deprived him of compensation clearly connected to work already performed (and, thus, unjustly enriched the employer). See, e.g., Harrison v. NetCentric Corp., 744 N.E.2d 622, 629-30 (Mass. 2001); Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251, 1257 (Mass. 1977). The rationale behind this exception is that every contract contains a covenant of good faith and fair dealing, and an employer breaches that covenant when it dismisses an at-will employee in order to deprive him of compensation fairly earned and legitimately expected for services already rendered. See Mullowney v. Data Gen. Corp., 143 F.3d 1081, 1083-84 (7th Cir. 1998) (applying Mass. law); King v. Driscoll, 673 N.E.2d 859, 862-63 (Mass. 1996). In short, this exception is designed to preclude an employer from taking an unfair financial advantage. McCone v. New Engl. Tel. & Tel. Co., 471 N.E.2d 47, 50 (Mass. 1984).

Here, the plaintiff's effort to fit his case within this isthmian exception depends upon his assumption that unvested stock options should be treated as deferred compensation for services already performed. This assumption is incorrect. It has been squarely addressed — and soundly rejected — by the Supreme Judicial Court of Massachusetts (SJC) in Harrison. There, the plaintiff alleged that his employer had terminated his employment in order to prevent the vesting of certain stock options. Harrison, 744 N.E.2d at 629-30. The SJC pointed out that the stock options vested over time only if the plaintiff continued in the defendant's employ and ruled that the "unvested shares are not earned compensation for past services, but compensation contingent on his continued employment." Id. at 630. The case at bar is materially indistinguishable from Harrison: the plaintiff's stock options vested over time, contingent on the continuation of the employment relationship. Thus, the unvested portion (which the plaintiff forfeited upon discharge) did not constitute earned compensation for past services. See id. Accordingly, the plaintiff's attempted end run around the at-will employment doctrine takes him into a dead end.

That concludes this aspect of the matter. The plaintiff was an at-will employee who served at the defendant's pleasure. Since no cognizable exception to the general rule pertains, the district court appropriately rejected the plaintiff's claim for

damages arising out of termination of the employment relationship. See generally Gram v. Liberty Mut. Ins. Co., 429 N.E.2d 21, 27-28 (Mass. 1981) (holding that the absence of good cause in terminating an at-will employee, without more, is insufficient to trigger liability for wrongful discharge).

## B. **Partial Rescission**.

The plaintiff next posits that the defendant unlawfully canceled a portion of the unvested stock options. The facts are straightforward. On March 23, 2000, the defendant, disappointed with the plaintiff's job performance, rescinded unvested stock options for 27,500 shares of stock. The cancellation of these options was memorialized both in a written notice sent to the plaintiff and in a form signed by the plaintiff acknowledging the action. The acknowledgment form was executed on March 27, 2000, and the plaintiff continued to work for the defendant until his eventual ouster on July 10, 2000.

The plaintiff now claims that the defendant had no right to take unilateral action to alter the terms of his employment agreement and that, in any event, the modification is invalid due to lack of consideration. The defendant counters that it had an absolute right to tinker with the number of options before they vested. It adds that the plaintiff assented to the partial rescission and that his continued employment after receiving notice

-13-

of the modification constituted valid consideration for the change in contractual terms.

As said, the offer letter and related documents established an at-will relationship. See supra Part III(A). While an at-will employment agreement does not bind the parties for a particular length of time, its terms nonetheless define the parties' rights and obligations during whatever period of time the employment relationship remains intact. See Sargent v. Tenaska, Inc., 914 F. Supp. 722, 726 (D. Mass. 1996) (explaining that an agreement for at-will employment may contain terms that are binding and effective during the life of the contract); Simons v. Am. Dry Ginger Ale Co., 140 N.E.2d 649, 653 (Mass. 1957) (similar). It appears, therefore, that the defendant's promise to grant stock options to the plaintiff constituted a term of the employment agreement (subject, of course, to the provisions of the vesting schedule, the company's stock plan, and the option agreement), and that the defendant did not have the unqualified right to alter that term.

Assuming that the defendant lacked a unilateral right to cancel unvested stock options, the question reduces to whether the partial rescission of the options was a valid consensual modification of the employment arrangement. Like the district court, Cochran, 2002 U.S. Dist. LEXIS 16204, at *23, we answer that question affirmatively.

Under Massachusetts law, the parties to a contract must agree to a modification. New Engl. Mut. Life Ins. Co. v. Harvey, 82 F. Supp. 702, 706 (D. Mass. 1949). Such an agreement may be express or implied. Rogers v. Rogers & Brother, 1 N.E. 122, 122-23 (Mass. 1885). In either event, however, the modification must be supported by consideration. Sargent, 914 F. Supp. at 727; Tri-City Concrete Co. v. A.L.A. Constr. Co., 179 N.E.2d 319, 320 (Mass. 1962).

In order to establish a valid modification here, the defendant had to show that the plaintiff not only consented to the partial rescission of the stock options but also received legally sufficient consideration in exchange for accepting this reduction in future benefits. The record demonstrates incontrovertibly that the plaintiff acquiesced in the partial rescission. It is uncontradicted that, in January of 2000, he participated in a meeting with his immediate superior in which he was informed that the company was unhappy with his performance and was contemplating taking back some of the stock options. He concedes that he was aware of the partial rescission that followed and that he signed an acknowledgment memorializing the action. Consent is, therefore, established.

That leaves the question of consideration. After the partial rescission, the defendant forbore from ending the employment relationship and the plaintiff continued to work for the

defendant for more than three months.  We think that this constituted mutual consideration.  Where, as here, the parties reach an agreement to modify the terms of an at-will employment contract, the employer's forbearance from ending the employment relationship, coupled with the employee's continued performance, can satisfy the consideration requirement.  See Gishen v. Dura Corp., 285 N.E.2d 117, 121 (Mass. 1972);[3] Patton v. Babson Statistical Org., Inc., 156 N.E. 534, 536 (Mass. 1927).

When all is said and done, this is a classic case of consideration.  When the modification took place, the employee had no right to continued employment and the employer had no right to the employee's future services.  Thus, each party provided consideration to the other sufficient to support a continuation of the employment relationship, on modified terms, for an indeterminate future period.

For these reasons, we conclude that the plaintiff's employment agreement was duly modified by the partial rescission of his unvested stock options.  Both parties thus were bound by the modification.

_____

[3]The modification in Gishen involved future commissions rather than the future vesting of stock.  285 N.E.2d at 118.  Because unvested stock options are not earned compensation for past services, but, rather, future compensation contingent on continued employment, Harrison, 744 N.E.2d at 629, this distinction is insignificant.  What matters is that, in each instance, the compensation remained to be earned and the employee had no contractual right to continue working in order to earn it.

## C.  **Number of Shares**.

We now reach the plaintiff's final assignment of error: his objection to the district court's calculation that, at the time of his ouster, he had a vested interest in options for only 25,002 shares.  See Cochran, 2002 U.S. Dist. LEXIS 16204, at *6, *23.

We begin by summarizing what the record reveals.  The defendant originally granted the plaintiff options for 60,000 shares.  On November 30, 1999, a three-for-two stock split increased that number to 90,000.  On March 23, 2000, options for 27,500 shares were rescinded, reducing the plaintiff's total to 62,500 — a fact that was clearly indicated on the statement furnished to the plaintiff and which he signed on March 27, 2000. On March 31, 2000, Quest stock split two-for-one, doubling the plaintiff's holdings so that he held options for 125,000 shares. The next day, options for 25,002 shares vested.

The district court found that the record was clear as to these facts.  The plaintiff's attack on that conclusion and on the resultant calculation has taken a variety of inconsistent forms. None has merit.

At the summary judgment stage, the plaintiff asserted that options for 45,000 shares had vested before his ouster.  He arrived at this figure on the theory that he had options for 180,000 shares and that twenty-five percent of them had vested on April 1, 2000.  As to this assertion, two observations suffice.

For one thing, the plaintiff did not then hold options for 180,000 shares; that rodomontade ignores the partial rescission. For another thing, twenty-five percent initial vesting is neither referred to in any documentary exhibit nor borne out by any other probative evidence. The plaintiff's claim is, therefore, groundless.

After the district court rejected this initiative, the plaintiff shifted gears. In his motion for reconsideration, Fed. R. Civ. P. 59(e), he maintained for the first time that the option statements sent to him by the plan administrator showed that options for 30,502 shares had vested on April 1, 2000. The district court summarily rejected this new initiative.

Litigation is not a game of hopscotch. It is generally accepted that a party may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling. E.g., DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 33 (1st Cir. 2001); Aybar v. Crispin-Reyes, 118 F.3d 10, 16 (1st Cir. 1997). This principle has deep prudential roots. Litigants normally must frame the issues in a case before the trial court rules. After that point, a litigant should not be allowed to switch from theory to theory like a bee in search of honey. Against this backdrop, the district court scarcely can be said to have abused its discretion in refusing to

reconsider its decision based on the plaintiff's newly raised argument.

In all events, the conclusory assertion that the plaintiff was shortchanged by some 5,500 shares is belied by the record. Prior to the partial rescission, the plaintiff had options for 90,000 shares. After the partial rescission, the plaintiff had options for 62,500 shares. In accordance with the standard vesting schedule and the parties' agreements, twenty percent of these options (i.e., options for 12,500 shares) were due to vest on April 1, 2000. The two-for-one stock split, effective on March 31, doubled both of these numbers, giving the plaintiff options for 125,000 shares, of which 25,000 were due to vest the following day.

Although that arithmetic seems irrefutable, the plaintiff nevertheless tries to refute it. His challenge takes two paths. First, he extracts a figure from the plan administrator's November 30, 1999 statement (which showed that options for 18,000 shares were due to vest on April 1, 2000) and a figure from the March 23, 2000 statement (which showed that options for 12,500 shares were due to vest on April 1, 2000). He then adds the excerpted figures together to arrive at a total of 30,500 shares. This is voodoo mathematics: adding the 18,000 shares that were set to vest before either the partial rescission or the later stock split took effect to the 12,500 shares that were set to vest after the rescission had

occurred matches two numbers that were never meant to be aggregated. The result is meaningless.

Alternatively, the plaintiff claims that after the two-for-one stock split, he had options for 180,000 shares, so that under the vesting formula options for 30,500 shares should have become irrevocable on April 1, 2000 (logically, the figure should be 36,000, but the plaintiff blithely ignores this discrepancy). This argument misconceives the effect of the partial rescission, which took effect <u>before</u> the stock split, not afterwards. The argument is, therefore, meritless.

On appeal, the plaintiff presses what could be regarded either as a variation on his second theory or as a third theory. In this court, he attempts to reinvent the chronology of events, suggesting that the two-for-one stock split occurred prior to the partial rescission of his stock options (and that, therefore, the partial rescission of 27,500 shares left him with options for 152,500 shares, of which twenty percent — 30,500 shares — were vested at the time of his dismissal). No matter how we view it, this suggestion is deeply flawed.

In the first place, it is a virtually ironclad rule that a party may not advance for the first time on appeal either a new argument or an old argument that depends on a new factual predicate. <u>E.g.</u>, <u>United States</u> v. <u>Bongiorno</u>, 110 F.3d 132, 133 (1st Cir. 1997); <u>Teamsters Union Local No. 59</u> v. <u>Superline Transp.</u>

<u>Co.</u>, 953 F.2d 17, 21 (1st Cir. 1992); <u>Clauson</u> v. <u>Smith</u>, 823 F.2d 660, 666 (1st Cir. 1987). The record here contains no basis for a departure from this settled practice, and we see no reason to treat with a neoteric theory that was not seasonably advanced below.

Even if we were disposed to reach it, the plaintiff's new argument as to the timing of the stock split has no footing in the record. The supposed "fact" on which it hinges — the sequence of events — was never asserted before the district court. To the contrary, the defendant filed a statement of undisputed material facts in support of its motion for summary judgment in which it stated that the two-for-one stock split occurred on March 31, 2000 (a few days <u>after</u> the plaintiff had acknowledged the effectiveness of the partial rescission). Under the applicable local rule, it was incumbent on the plaintiff to include in his opposition to the defendant's motion "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried." D. Mass. R. 56.1. Here, however, the plaintiff chose not to contest the date of the stock split, and the local rule provides that "material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." <u>Id.</u> Accordingly, the stock split date is deemed admitted. <u>See</u> <u>Carreiro</u> v. <u>Rhodes Gill & Co.</u>, 68 F.3d 1443,

1446 n.3 (1st Cir. 1995); <u>FDIC</u> v. <u>Anchor Props., Inc.</u>, 13 F.3d 27, 31 (1st Cir. 1994).  This admission places the sequence of events exactly as the district court determined it to be (and, thus, defenestrates the plaintiff's belatedly proffered theory).

**IV.  CONCLUSION**

We need go no further.  For the reasons elucidated above, we affirm the district court's entry of summary judgment in favor of the defendant.

**<u>Affirmed</u>**.  **<u>Costs to appellee</u>**.