Cratsley, J.
The plaintiff, William Okerman (“Oker-man”), brought this action against his former employer, VA Software Corporation (“VA Software”),[2] claiming breach of contract (Count I), quantum meruit (Count II), breach of good faith and fair dealing (Count III), promissory estoppel (Count IV) and violation of the Wage statute, G.L.c. 149 (Count V), as a result of his termination from VA Software. Before this Court is VA Software’s motions for summary judgment as to Counts I-IV and judgment on the pleadings as to Count V.
BACKGROUND
All of the following information comes from the summary judgment record which consists of undisputed facts agreed by both parties, deposition testimony, and documentary evidence.
Mr. Okerman graduated cum laude from Harvard University. Prior to entering into negotiations with VA Software, Okerman had 23 years of sales experience selling hardware and/or software for at least eight different companies. In each position, Okerman earned commissions and acknowledged that while working for at least seven of the previous companies, the commission plans changed from time to time, including fluctuations in quotas and percentages earned on sales.
Offer Letter
On March 24, 1999, VA Software extended a written offer of employment (“Offer Letter”) for the position of Boston Marketing Manager to William Okerman (“Okerman”), which Okerman accepted. The Offer Letter provided in pertinent part that:
Your compensation will consist of
A base monthly salary of $7,500.00.
Participation in the company’s stock option plan with 20,000 at the standard option price granted on your starting date subject to approval by the board of directors.
Health insurance through Lifeguard and dental insurance through the Guardian.
3 weeks paid vacation each year.
The standard VA Research Commission Plan for 1999 which has commission as follows;
1.5% of revenues to 3,000,000 in revenues
2.0% of revenues to 6,000,000 in revenues
3.0% of revenues above $6,000,000 in revenue
A sign-on bonus of $2,000 subject to refund if you elect to voluntarily terminate employment with the company within 6 months of your start date.
A $5,000 per month draw against commissions recoverable monthly for 6 months.
As with all VA Reseach staff, your employment is “at will” meaning either you or the company may terminate your employment with two weeks written notice . . .
Although the Offer Letter references the VA Research Commission Plan for 1999, the plan had not yet been drafted, finalized or presented to Okerman. Okerman commenced working at VA Research on March 29, 1999. On that date, VA Software granted Okerman 20,000 stock options. Pursuant to the Offer Letter, twenty-five percent of the stock options would vest a year later on March 29, 2000. Thereafter, the stock options vested monthly on the 29th day of each and every full month of Okerman’s employment.
November 1999 Plan
In preparation for VA Software’s initial public offering in December of 1999, Robert Russo, Senior Vice President of World Wide Field Operations, in conjunction with Linda Yamauchi, Director of Sales Operations, developed a Compensation Overview, Policy and Plan (“November 1999 Plan”). The purpose of the November 1999 Plan was to “provide a consistent, comprehensive framework from which to understand and implement the plans.” Essentially, the November 1999 Plan provided the overarching framework for the promulgation of variable compensation plans for VA Software’s salespeople, and governed the terms by which VA Software managed its sales employees.
The November 1999 Plan became effective on November 4, 1999, and states, in relevant part:
VA [Software] management reserves the right to expand, reduce or otherwise change the territory and quota assignment as deemed appropriate to align with changes in business conditions. Business conditions include, but are not limited to, VA [Software’s] business goals, product order and revenue plans, organization structure and customer business conditions. Changes are at the sole dis *515 cretion of management judgment, may be made at any time and may have a retroactive effective date.
The plan also provided that “for all matters of administration, including modification, the Senior Vice President of World Wide Field Operations shall have the sole and final authority.” Accordingly, Robert Russo had the final authority to interpret the document and compensation plans. Okerman disputes that the terms of the November 1999 Plan affect the terms of his employment and compensation package.
Yamauchi states in her affidavit that she had several conference calls with the members of the VA Software sales force in which she explained the purpose of the November 1999 Plan. She says she informed the sales force of the new compensation plan and addressed the fact that it would be effective beginning the second quarter of fiscal year 2000 (November 1999). Yamauchi also says she distributed the November 1999 Plan to all VA Software salespeople. Okerman disputes that he received a copy of the November 1999 Plan and that Yamauchi informed him of his participation.
February 8, 2000 Plan
On or about February 8,2000, VA Software notified all of its sales employees, including Okerman, that it was implementing a new variable compensation plan (“February 8, 2000 Plan”). VA Software states that the February 8, 2000 Plan was developed in order to meet the new corporate objectives of VA Software in connection with its initial public offering in December of 1999.[3] Okerman, however, alleges that the new plan was implemented in bad faith in order to deprive him of his commissions already earned.
VA Software retroactively applied the February 8, 2000 plan to November 1, 1999, so that it corresponded with VA Software’s new fiscal year, which it converted from a calendar year to one that commenced on July 29 (making November 1 the start of Quarter 2).[4] Okerman, however, alleges that the February 8, 2000 Plan and its retroactive application was developed in bad faith to deprive him of commissions for services rendered. Further, Okerman maintains that the terms of the November 1999 Compensation Plan do not affect his employment terms and compensation.
On February 11, 2000, Okerman signed the February 8, 2000 Plan. However, Okerman contends that he signed the Plan solely to acknowledge its receipt. Further, Okerman avers that he continued to object to the commission structure to his supervisor, David Balch (“Balch”). Okerman admits that he continued his employment with VA Software, but alleges he did so because Balch represented to him that “the money was in the stock” and that Okerman had to remain employed in order to realize the value of his stock options. After objecting to the change in commission, Okerman continued to work for VA Software.
September 1, 2000 Plan
On or about September 1, 2000, VA Software notified its sales employees, including Okerman, that it was implementing a new variable compensation plan (“September 1, 2000 Plan”). VA Software retroactively applied the September 1, 2000 Plan to July 31, 2000 which coincided with the beginning of VA Software’s first quarter of fiscal year 2001. Okerman contends that the plan does not apply to him and that VA Software retroactively applied the plan in bad faith. That same day, Okerman signed the September 1, 2000 Plan which included a “bid bonus” program. Okerman argues that he signed the September 1,2000 Plan only to acknowledge its receipt. Okerman continued to work for VA Software.
November 27, 2000 Plan
On or about November 27, 2000, VA Software notified its sales employees, including Okerman, that it was implementing a new variable compensation plan (“November 27, 2000 Plan”). VA Software alleges that it changed its plan because it realized that the market was not cooperating with company objectives and that VA Software was headed for “difficult financial times.” One of the changes in the November 27,2000 Plan was the elimination of the “bid bonus” program. Okerman disputes that VA Software eliminated the “bid bonus” program since it referenced the “bid bonus” program in the November 27, 2000 Plan and the subsequent March 5, 2001 Plan. As with the other plans, the November 27, 2000 Plan applied retroactively. The effective dates of the November 27, 2000 Plan was October 28, 2000 through January 26, 2001, which corresponded with the second quarter of fiscal year 2001. Okerman contends that the plan does not apply to him, that the plan could not be applied retroactively, and that VA Software changed the plan in bad faith to deprive him of compensation.
On December 1,2000, Okerman signed the November 27, 2000 Plan. Okerman admits that he signed the plan, but only to acknowledge its receipt. He contends that he did not accept the terms of the new compensation structure. Okerman continued to work at VA Software.
March 5, 2001 Variable Compensation Plan
On or about March 5, 2001, VA Software notified its sales employees, including Okerman, that it was implementing a new variable compensation plan (“March 5, 2001 Plan”). The March 5, 2001 Plan applied retroactively. Its effective dates were January 27, 2001 through April 28, 2001, which corresponded with the third quarter of fiscal year 2001.
On May 20, 2001, Okerman signed the March 5, 2001 Plan. Okerman admits that he signed the plan, but only to acknowledge its receipt. Although he disputes that he agreed to the new plan terms, Okerman continued to work for VA Software.
*516 May 7, 2001 Variable Compensation Plan
On or about May 7, 2001, VA Software notified its sales employees, including Okerman, that it was implementing a new variable compensation plan (“May 7, 2001 Plan”). The May 7, 2001 Plan applied retroactively. Its effective dates were April 29, 2001 through July 28, 2001, which corresponded with the fourth quarter of fiscal year 2001.
On May 20,2001, Okerman signed the May 7,2001 Plan. Okerman alleges he signed the plan only to acknowledge its receipt. Okerman continued to work for VA Software.
Akamai Account
In March 2000 VA Software acquired TruSolutions, which sold a product that competed with VA Software to a mutual customer, Akamai Technologies (“Akamai”). Initially, Okerman and the TruSolutions salesperson, Thomas Boyd (“Boyd"), sold their own individual products to Akamai. Okerman’s supervisor, David Balch, notified Okerman that beginning in fiscal year 2001, Okerman and Boyd would manage the Akamai account jointly, splitting the compensation 50/50, regardless of who secured the sale. Okerman acknowledges that he agreed to the split and that he continued to work for VA Software. However, Okerman argues that that decision was not voluntary. Instead, Okerman contends that VA Software instituted the “split” in order to cut him out of the Akamai account.
Okerman acknowledges that he earned approximately $100,000 in salaiy and draw payments during the nine months he worked in 1999. Okerman argues that he earned commissions in 1999, but was not paid them, in violation of his employment agreement. On March 29, 2000, Okerman’s first anniversary date, Okerman vested 15,000 of his 60,000 stock options. Okerman also admits that he vested 11,250 shares of stock options in 2000, in addition to the 15,000 shares of stock options he vested on March 29, 2000.
In June of 2001, VA Software informed its employees that it was exiting the hardware business, and that as a result, it was forced to terminate the majority of its employees effective June 29, 2001. Although most employees were terminated by June 29, 2001, Oker-man stayed on at VA Software through July 27, 2001, so that he could close some sales that he had previously negotiated.
Okerman’s last day at VA Software was Friday, July 27, 2001, the last day of VA Software’s fiscal year. Okerman contends, however, that his last date was chosen in order to deprive him of the vesting of an additional 1,250 shares of stock options he could have received had he worked through July 29, 2001.
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Corrections, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving parly bears the burden of affirmatively demonstrating that there is no genuine dispute of material fact on every relevant issue “even if he would have no burden on an issue if the case were to go to trial.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989), citing Attorney General v. Bailey, 367, 371 (1982). Once the moving party establishes the absence of a triable issue, the non-moving party must respond and allege specific facts establishing the existence of a genuine issue of material fact in order to defeat the motion. Pederson v. Time, Inc., 404 Mass. at 17.
A. Breach of Contract (Count I)
VA Software argues that it is entitled to summary judgment as to Okerman’s breach of contract claim because the parties mutually agreed to modify the original contract, the Offer Letter, on five different occasions. VA Software alleges that as an at-will employee, Okerman received valid consideration for the modifications in his continued employment with VA Software, even though the modifications resulted in him receiving a lower compensation rate. Further, it alleges that it paid Okerman the compensation due him under each commission plan in effect at each relevant time. Okerman maintains, however, that he never agreed to any modification of the original Offer Letter. Thus, he argues that VA Software breached their contract when it failed to pay him according to the terms set out in the original Offer Letter.
Okerman concedes that he signed each subsequent modification letter which detailed the changes to his commission structure. However, he maintains that he signed the letters only to acknowledge receipt of the commission changes. He states that he never consented to any of the changes. In support of his position, Okerman cites to the fact that he signed his name next to the “Received By” line on each commission change. Further, Okerman maintains that he voiced his protest regarding the commission changes to his direct supervisor via email.
Notwithstanding Okerman’s objections and his argument regarding his acknowledgment of receipt, this Court concludes that VA Software is entitled to summary judgment as a matter of law. In Gishen, the plaintiff was a seasoned salesperson who agreed to certain compensation changes during his employment. Gishen v. Dura Corp., 362 Mass. 177, 178-79 (1971). The changes in compensation resulted in plaintiff receiving a lower commission rate. Id. at 183. After termination, he sued his former employer to recover certain commissions provided for in the parties’ original agreement. Id. at 180. Our Supreme Judicial Court (SJC) held that, as a matter of law, an at-will employee’s decision to continue working for his employer after accepting significantly lower commission rates constituted both consideration and an assent to support a modification of his employment *517 contract. Id. at 183; see also Cochran v. Quest Software, Inc., 2002 WL 1964252 (D.Mass. 2002) (Selva, J.). The high court, therefore concluded that the modification of the parties’ original contract was valid and binding on the company. Gishen v. Dura Corp., 362 Mass at 183. The SJC upheld the jury award of $82,458.84 in favor of the plaintiff. Id. at 186.
As in Gishen, Okerman knew of all five compensation changes and assented to each subsequent modification by signing it and continuing to work for VA Software. Id. at 183. As an at-will employee, Okerman could have been terminated for any reason. Pollen v. Aware, Inc., 53 Mass.App.Ct. 823, 827 (2002). Thus, although Okerman did voice his initial objections regarding the changes in his commission structure to his immediate supervisor after the first commission structure change, Okerman nevertheless continued to work for VA Software until it exited the hardware business approximately a year and a half later. In continuing to work for VA Software after the commission changes and accepting a lower commission compensation, this Court concludes that Okerman assented and received adequate consideration for the modification of the contract. Id. at 183. The mere fact that Okerman argues that he only acknowledged receipt and did not consent to the changes does not alter this legal conclusion. By continuing to work for VA Software, Okerman consented to each subsequent commission structure change. Thus, as a matter of law, VA Software is entitled to summary judgment on the plaintiffs breach of contract claim.
B. Quantum Meruit (Count II)
Summary judgment in VA Software’s favor must also be granted as to Okerman’s quantum meruit claim. As outlined above, Okerman assented and agreed to each subsequent compensation plan modification. Therefore, Okerman’s compensation is governed by the terms of each commission plan contract in effect at the time. Thus, because Okerman is entitled to commissions earned pursuant to the commission compensation plan outlined in each contract, this Court does not have to reach the quantum meruit claim. See Maddaloni v. Western Mass. Bus Lines, Inc., 386 Mass. 877, 883 (1982) (court did not reach issue of quantum meruit recovery where plaintiff was entitled to commissions pursuant to contract). VA Software is entitled to summary judgment as a matter of law on the quantum meruit claim.
C. Breach of the Covenant of Good Faith and Fair Dealing (Count III)
VA Software contends that it is entitled to summary judgment on Okerman’s breach of good faith and fair dealing claim because it changed its commission structure in good faith based on business decisions and the declining economy. Further, it maintains that Okerman has not shown any evidence of bad faith in changing the commission plans.
Okerman, however, contends that the commission plans were subsequently changed in bad faith to deprive him of his earned commissions. In support of his assertion, Okerman contends that he secured Akamai, VA Software’s largest client. Based on Okerman’s efforts, VA Software generated substantial revenues. Okerman maintains that VA Software required him to continuously forecast his upcoming Akamai orders. Based on those upcoming projections, Okerman alleges that VA Software changed the commission compensation plans and applied them retroactively in bad faith to deprive him of his earned compensation.
Although Okerman was an at-will employee, Massachusetts law provides an implied covenant of good faith and fair dealing in at-will employment relationships. See Fortune v. Nat’l Cash Register Co., 373 Mass. 96, 102 (1977). Whether VA Software changed Okerman’s commission structures in bad faith to avoid paying him his earned commission is a question of fact. The Court has long recognized that claims of breach of the covenant of good faith and fair dealing are rarely appropriate for summary judgment because the employer’s motivations or state of mind, is a factual inquiry. See LaBonte v. Hutchins & Wheeler, 424 Mass. 813, 820 (1997), citing Flesner v. Technical Communication Corp., 410 Mass. 805, 809 (1991) (“where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate”). Thus, because VA Software’s motive and intent in changing the commission plans and applying them retroactively to Okerman’s sales are questions of fact, summary judgment is inappropriate. VA Software’s motion for summary judgment as to the breach of good faith and fair dealing claim is denied.
D.Promissory Estoppel/Detrimental Reliance (Count IV)
VA Software alleges that it is entitled to summary judgment as to Okerman’s promissory estoppel claim. It asserts that Okerman cannot maintain this claim based on any alleged promises made by VA Software because Okerman’s reliance on any alleged promise would be unreasonable. VA Software maintains that it paid Okerman according to each commission plan in effect at the time.
Okerman, however, alleges that VA Software made two promises; (1) that he would be compensated according to the commission compensation plan structure set out in the original Offer Letter and (2) that he would obtain a windfall in his vested stock options accruing each month on the 29th day. Although VA Software promised in the original Offer Letter that it would compensate Okerman according to the commission compensation plan set out in Offer Letter, the commission structure was subsequently modified several times by the assent and agreement of Okerman. Thus no proimssory estoppel claim lies for promise (1).
*518 Okerman further alleges that VA Software promised him that he would receive a windfall from his vested stock options and that in order to receive that windfall he had to continue working for VA Software. This Court concludes that any alleged reliance by Okerman on any potential windfall from his vested stock options was unreasonable. See Hall v. Horizon House Microwave, Inc., 24 Mass.App.Ct. 84, 94 (1987) (holding “[a] well founded hope” is not enough to support reasonable reliance). Thus, because Okerman knew or should have known that VA Software could not predict the final gains he might obtain from his vested stock options, VA Software’s remarks amount only to a well founded hope that the vested stocks would yield great earnings in the future. Okerman cannot establish that he reasonably relied on VA Software’s representations. Thus, VA Software is entitled to summaiy judgment as a matter of law on the plaintiffs promissoiy estoppel claim.
E.Violation of Wage Act Statute, G.L.c. 149, §148 (Count V)
VA Software alleges that it is entitled to judgment on the pleadings as to Okerman’s claim of violation of the Wage Act Statute, G.L.c. 149, §148. In support of its argument, VA Software asks this Court to take notice of a Superior Court Judge’s decision which allowed the other defendant’s motion to dismiss the violation of the Wage Act Statute claim in this same case. The Court [Locke, J.), in a decision dated June 25, 2002, allowed the other defendant’s, Larry Augustin, CEO of VA Software (“Augustin”), motion to dismiss the Wage Act Statute violation claim citing as its reason that Okerman’s “right to commissions were contingent upon the attainment of certain sales goals being reached and therefore are not ‘definitely determined’ under the Wage Act.” Okerman v. VA Software & Larry Augustin, Civil No. 01-01825 (Norfolk Super.Ct. June 25, 2002) [Locke, J.). The Court declined to expand the scope of G.L.c. 149 to cover the commissions alleged by Okerman, citing Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc., 113 F.Supp.2d 164, 167 (D.Mass. 2000); Doherty v. American Medical Response of Massachusetts, 7 Mass. L. Rptr. 725, 1997 Mass.Super., LEXIS 79; Huebsch v. Katahdin Industries, Inc., 13 Mass. L. Rptr. 180, 2001 WL 716884 (Mass.Super.Ct. April 24, 2001); Locke v. Sales Consultants of Boston, Inc., 13 Mass. L. Rptr. 164, 2001 WL 716911 (Mass.Super.Ct April 13, 2001) [Hinkle, J.). Id. Further, Judge Locke held that “the Wage Act was intended to protect wage earners who relied on the payment of their weekly or bi-weekly salary . . . rather than on employees who had opportunities for commissions in addition to a healthy salary.” Id.
Okerman sought interlocutory review of the Court’s decision dismissing the claim against Augustin, pursuant to G.L.c. 211, §118. In his petition, Okerman argued that the trial court judge erred in finding that his commissions were not “definitely determined,” and that the value of his compensation is irrelevant for Wage Act Statute purposes. In support of his position, Okerman cited Lohnes v. Darwin Partners, Inc., Civil No. 02-1299 (Norfolk Super.Ct. July 23, 2002) [Gants, J.) (15 Mass. L. Rptr. 157), which held that contingent commissions are protected by the Wage Act once the contingency occurs and that the value of the individual’s compensation is irrelevant in deciding whether the Wage Act applies. Id. at 4-5.
After consideration, the single justice of the Appeals Court [Kass, J.) denied Okerman’s relief under G.L.c. 231, §118, writing that, “[w]hether the commission arrangement falls under G.L.c. 149, §148, is an arguable proposition . . .” After some further analysis, he then held, “that the statute is applicable to wage earners and not to commissions in the nature of additional compensation.” Okerman v. VA Software Corp. & Larry M. Augustin, Civil No., 02-J-415 (App.Ct. July 26, 2002) (Kass, J., single justice).
G.L.c. 149, §148, provides in pertinent part that:
[tjhis section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employees, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty [providing a private cause of action with the assent of the Attorney General].
Id. The statute was intended primarily “to prevent unreasonable detention of wages” by requiring “regular and frequent payments.” American Mutual Liability Ins. Co. v. Commissioner of Labor & Industries, 340 Mass. 144, 147 (1959). The Massachusetts Appeals Court has construed the scope of the Wage Statute Act narrowly. See Commonwealth v. Savage, 31 Mass.App.Ct. 714, 716 (1991).
In Baptista v. Abbey Healthcare Group, Inc., No. 95-10125, slip-op (D.Mass. April 10, 1996), Judge Stearns concluded that “the only impression that can possibly be derived from [the Wage Act], is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation.” Id. at 8. Judge Stearns acknowledged that the Supreme Court applied the statute to corporate executives as well as low level employees, however, he noted specifically that “its holding is limited to the payment of ordinary wages and wage equivalents .. .” Id., citing Massachusetts v. Morash, 490 U.S. 107, 117 (1989). Baptista attempted to obtain payment of stock options and the Court held that “in this case, there is no reason to extend the protections of the wage earner’s statute to cover bonuses potentially owing to highly paid executives . . Id. at 9.
Consistent with the reasoning and decisions cited by the two prior justices reviewing this same issue in this case, this Court concludes that VA Software is *519 entitled to judgment on the pleadings as to Count V of Okerman’s complaint. Okerman’s commissions were above and beyond his base salary. Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc., 113 F.Supp.2d 164, 168 (2000). Further, his commissions were contingent on the attainment of certain sales goals being reached and therefore were not “definitely determined” under the Wage Act. Id. Thus VA Software’s motion for judgment on the pleadings is allowed.
ORDER
For the above-mentioned reasons, the Court (1) ORDERS that the defendant’s motions for summary judgment as to Counts I, II and IV arc ALLOWED; (2) ORDERS that the defendant’s motion for summary judgment as to Count III is DENIED; and (3) ORDERS that the defendant’s motion for judgment on the pleadings as to Count V is ALLOWED.

Okerman also brought suit against the CEO of VA Software, Larry M. Augustin, alleging a violation of the Wage Statute (Count VI). The Court (Locke, J.) allowed Augustin’s motion to dismiss.

VA Software argues that in making the changes to the commission structures, it did not analyze the effect of the retroactive application on the commissions of any of its salespeople and did not make the changes with the intent to harm anyone.

The November 1999 Plan permitted the retroactive application.