van Gestel, Allan, J.
This matter is before the Court on Defendant’s Motion for Summary Judgment Based on Plaintiffs At-Will Employment, Paper #17.
BACKGROUND
The plaintiff, David N. Tomer (“Tomer”), has sued his former employer, Hollister Associates, Inc. (“Hollister”), in a three-count complaint: (1) charging breach of a December 2000 agreement; (2) seeking unjust enrichment damages resulting from that breach; and (3) asking for declaratory relief regarding a non-competition provision in the December 2000 agreement. Tomer claims that there is due to him at least $812,917 in unpaid compensation.
This suit was filed on April 28, 2005.
Hollister Associates, Inc. is a privately held, temporary and permanent placement firm, providing information technology, financial services, accounting, and secretarial/administrative personnel services to businesses in Eastern Massachusetts.
Kip Hollister is the company’s president, and she is the sole corporate shareholder.
Tomer was hired as a “Director” by Hollister in 1992. On May 11, 1992, Tomer and Hollister executed an employment agreement (the “1992 Agreement”) which expressly stated that Tomer was being hired for a definite term of one year, at a “guaranteed salary of $65,000, paid weekly, beginning May 11, 1992 and ending May 11, 1993.” Tomer continued in Hollister’s employ thereafter.
Tomer and Hollister executed a new agreement on December 5, 1996 (the “1996 Agreement”), which expressly stated that Tomer was “an at-will employee of Hollister.” The 1996 Agreement increased Tomer’s salary to $100,000, plus abonus. The 1996 Agreement also granted Tomer “phantom stock" units which represented a 20% contingent stock ownership interest in the Hollister divisions for which Tomer had direct management responsibilities. The contingency was that Tomer’s stock interest would vest only if Hollister was sold or if there was a change of control in Hollister’s ownership.
The 1996 Agreement also contained an 18-month non-competition provision.
In the year 2000, Hollister’s revenues exceeded $23 million. Tomer’s year 2000 compensation was $955,817.[1] Based on his job performance and Hollister’s financial success, in 2000 Tomer was promoted to Vice President and was given overall responsibility for Hollister’s Administrative, Technology and Financial Services Groups.
After several months of discussion, on December 31, 2000, Tomer executed a new employment agreement (the “2000 Agreement”). The 2000 Agreement is made up of two documents: a single-page “Memorandum” relating to compensation terms, and a 13-page “Agreement” containing a variety of other provisions.
The Memorandum portion of the 2000 Agreement establishes Tomer’s annual salary, “starting an January 1, 2000,” at $400,000. It also contains a contingent bonus plan.
The Agreement portion of the 2000 Agreement contains the following provisions that are pertinent to this case.
Section 1 contains certain definitions of: “Change in Control,” “Confidential Information,” and “Purchase Price,” the latter for purposes of compensation in the event of a change of control.
Sections 2 through 4 deal exclusively with changes in the grant of phantom stock in the event of a change of control in Hollister. Tomer’s percentage of interest in Hollister under these sections is set at 10%.
Section 5 is entitled “At-Will Employment” and reads as follows:
Executive [Tomer] acknowledges that his employment with the Company [Hollister] is “at-will” in nature, meaning that his employment may be terminated at any time by either the Company or the Executive for any reason. If Executive chooses to voluntarily terminate his employment pursuant to this Section 5, Executive agrees to give Hollister three (3) months prior written notice of his intention to terminate his employment. Hollister will provide Executive with three (3) months prior written notice of termination of his employment, except that Hollister may terminate Executive’s employment at any time without prior written notice for cause. Executive understands and agrees that the restrictions and duties set forth in paragraphs 6 and 7 are continuing in nature and shall survive any termination of his employment with the Company.
Section 6 is a new non-competition section. It extends the non-competition period from 18 months to five years.
Section 7 is a non-disclosure of confidential information section.
By Section 12, the 2000 Agreement is to be governed and construed by the law of Massachusetts.
Section 15 is an integration clause That reads as follows:
This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and there are no understandings or agreements relative hereto which are not fully expressed herein. All prior agreements with respect to the subject matter of this Agreement are superseded by this Agreement. No amendment to or waiver or discharge of this Agreement will be valid unless in writing and signed by both of the parties hereto.
In March 2004, Tomer voluntarily resigned by a written letter, with his resignation to become effective *489 on June 1, 2004. Tomer’s resignation letter reads in its entirely as follows:
Kip, 3/6/04
As a follow up to our meeting Monday, March 1, 2004, and in accordance with our agreement of December 2000, please accept this letter as my formal letter of resignation. This will begin my required three-month notice, which will result in a final termination date of June 1, 2004.
As provided by our agreement, I request Hollister to provide financial data for 2003, to-date for 2004, and projected through 2004. The data should contain material of such a nature as to be sufficient to determine an accurate valuation of Hollister.
This information should be forwarded to my advisor by March 31, 2004. Let me suggest that we set a date for a follow up meeting of Monday April 5, 2004, to further discuss this matter.
Sincerely,
Dave
Thereafter, following lengthy negotiations in which Tomer was represented by counsel, on February 24, 2005, Tomer and Hollister executed an Addendum to the 2000 Agreement in which the parties agreed to value the company as of the date of Tomer’s resignation at $1.5 million. This effectively set the value of Tomer’s phantom stock at $ 150,000. This was the only matter of substance contained in the Addendum.
It is what occurred between December 31, 2000, when the 2000 Agreement was executed, and March of 2004, when Tomer voluntarily resigned from Hollister, that forms the basis for Tomer’s claims in this case.
Due to a downturn in the economy in early 2001, Hollister’s profits[2] went from roughly $23 million in 2000 to $16.2 million in 2001.
In June 2001, Hollister’s accountant recommended an across-the-board 20% pay cut. Effective as of the last week of June 2001, Tomer’s salary was reduced 20% from $400,000 to $320,000.
On June 14, 2001, there was an exchange of emails between Tomer and Kip Hollister on this subject. Tomer started the e-mail conversation as follows:
[L]arry will be calling you re budget.
[W]e need to get the directors together on (M)onday and outline the need to hit budget throughout year.
[H]e has me down for 20% cut. [I] recommend that [M]ike and [S]mitty do the same. [D]on’t touch [J]eanine, [N]ancy [D] or [N]ancy [W]. [Y]ou/me should talk to them individually.
[W]e need to evaluate month to month. [I]f we have to go deeper then so be it.
Kip Hollister responded:
Yikes,,,, yes Larry left me message and we played phone tag a ton yesterday, but to no avail. Chris is bringing me budgets as I write, here she is, and I want to look at Gorman’s specifically, to see if he is going backwards or forwards, as unfortunately, he needs to go forward, as last year was a start up, killer year. Agreed not to touch the 2 [N]ancy’s, and let’s look at budgets for other 2, and try hard to do them too. This kills me so much, but hey, we all are doing it and me the most of everyone, so if all know this, how can you say no, right???? Kevin, a.d.d. was just her, crazy man, and off to c.v. with Corey, and has a few more set up, and make sure he takes others with him to offset his madmess.
Tomer then responded with an e-mail which read:
YES. F_IT. 20% NOW OR POTENTIAL FOR A LOT OF HURT LATER [I] don’t want to do this either. [W]e have no choice. [A]nd if we can come back — like I think we can — then give back and do bonuses if possible. [S]taying alive is the name of the game ...
This entire e-mail exchange took approximately 26 minutes.
In September 2001, Tomer’s salary was further reduced to $200,000 per year. In his deposition, Tomer testified that he went “ballistic” when Kip Hollister informed him that his salary would be cut a second time.
Hollister’s “profits” continued to plummet, from $16.2 million in 2001 to $6.3 million in 2002.
In April 2002, Kip Hollister sent a letter to all “Directors,” which stated: “Given the current economic conditions and the state of our industry and company, we have had to reduce the compensation levels of the entire director and ownership members once again.” In 2002, Tomer’s salary was reduced to $75,000.
During a deposition on June 25, 2002, in Tomer’s unrelated divorce proceeding, he testified as follows:
Q. Have you had any discussions with Mrs. Hollister about redoing the employment contract?
A. No, sir.
Q. Why not?
A. We’re just trying to stay alive and survive in a recession.
Q. Do you have any intention of leaving there?
A. No, sir. I’m going down with the ship, if it goes down.
Hollister notified Tomer in advance each time his salary was reduced. Each salary reduction was prospective — i.e., on a going forward basis — and Tomer continued working at Hollister at the lower salary after each reduction.
Nobody ever promised Tomer at the time of any of his salary reductions that his salary would be increased again, although both he and Kip Hollister seemed to hope so.
Further, it is undisputed that Tomer accepted his weekly pay, with the reduced compensation, every *490 single week for the three years between his first salary reduction in June of 2001 and his resignation in June of 2004.
This is the context in which the summary judgment motion was presented to the Court.
DISCUSSION
“Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law.” M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 89 (2004); Kesler v. Pritchard, 362 Mass. 132, 134 (1972). Mass.R.Civ.P. Rule 56(c). The moving party— here Hollister — bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The moving party may satisfy its burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
The Court begins with the 2000 Agreement which, as noted above, is contained in two documents — the “Memorandum” and the “Agreement.” The Court reads these two documents as constituting the initial makeup of the employment agreement in issue.
The Memorandum recites that Tomer’s annual salary is $400,000. In Section 5, the Agreement makes clear that Tomer is an employee-at-will,[3] and Section 15, the integration clause, states that no amendment to or waiver or discharge of the Agreement will be valid unless in writing and signed by both of the parties thereto.
While an at-will employment agreement does not bind the parties for a particular length of time, its terms nonetheless define the parties’ rights and obligations during whatever period of time the employment relationship remains intact. See Sargent v. Tenaska, Inc., 914 F.Sup. 722, 726 (D.Mass. 1996); . . . Simons v. Am. Dry Ginger Ale Co., 335 Mass. 521, [524] (1957).
Cochran v. Quest Software, Inc., 328 F.3d 1, 9 (1st Cir. 2003).
Thus, the Court observes that Tomer’s salary under the 2000 Agreement was $400,000 annually until either his employment terminated or he and Hollister agreed to a modification.
Also, generally, because of the integration clause in Section 15, any modification is said to be invalid unless in writing and signed by both of the parties thereto. However, an integration clause requiring a writing to modify a written agreement is not always the final answer. If “the evidence of a subsequent oral modification ... [is] of sufficient force to overcome the presumption that the integrated and complete agreement which requires written consent to modification, expresses the intent of the parties,” then a writing is not needed. Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 439 & n.10 (1992).
It is a settled principle of law that “[t]he mode of performance required by a written contract may be varied by a subsequent oral agreement based upon a valid consideration.” Siegel v. Knott, 316 Mass. 526, 528 (1944). First Pa. Mortgage Trust v. Dorchester Sav. Bank, 395 Mass. 614, 625 (1985). Wesley v. Marsman, 393 Mass. 1003, 1004 (1984). Schinkel v. Maxi-Holding, Inc., 30 Mass.App.Ct. 41, 47 (1991). Additionally, a provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract. “Mutual agreement on modification of the requirement of a writing may . .. ‘be inferred from the conduct of the parties and from the attendant circumstances’ of the instant case.” First Pa. Mortgage Trust v. Dorchester Sav. Bank, supra at 625, quoting Flynn v. Wallace, 359 Mass. 711, 715 (1971).
Id. at 439.
Under Massachusetts law, the parties to a contract must agree to a modification . . . Such an agreement may be express or implied ... In either event, however, the modification must be supported by consideration.
Cochran, supra, 328 F.3d at 9.
The integration clause here calls for a “writing signed by both of the parties.” In this modern age, this Court considers e-mail communications, in which the sender and recipient are clearly identified, to constitute writings. And when there is a string of e-mails, each signed off by two people, over a span of 26 minutes — like there was here between Tomer and Kip Hollister on June 14, 2001 — this Court considers the entire string to be a writing signed by both parties.
Those e-mails facially demonstrate that Tomer was involved, as a senior executive, with Kip Hollister, the company’s president, in implementing the salary reductions, including his own. Further, those e-mails show that Tomer, although not wanting to do so, clearly was in agreement that it was necessary. “[Staying alive is the name of the game,” he said.[4]
Thereafter, and despite the fact that nobody ever promised Tomer at the time of any of his salary reductions that his salary would be increased again, he accepted his weekly pay, with the reduced compensation, every single week for the three years between his first salary reduction in June of 2001 and his resignation in June of 2004.
In any event at a minimum the Court considers these e-mails part of an oral modification assented to by Tomer and supported by consideration. Tomer continued his employment relationship with Hollister for three years after the June 2001 first reduction of *491 his salaiy. He continued also after each of the subsequent two reductions. A “new unilateral contract is formed” “eveiy time the employee accepts the new offer by performance (such as continued employment)” — "a day’s work for a day’s wages." Kavanagh v. City of Phoenix, 87 F.Sup.2d 958, 966 (D.Az. 2000). Given that as an employee-at-will he could quit at any time, Tomer’s actions more than satisfy any requirement for the modification to his 2000 Agreement. See Cochran, supra, 328 F.2d at 9-10. See also, Okerman v. VA Software Corporation, 2003 WL 21960599*1, *5 (Mass.Super. 2003) (16 Mass. L. Rptr. 513).
“[A]s matter of law, there were both consideration and assent for the February modification in Gishen’s continuing to work for Dura, with its knowledge and approval, at considerably lower commission rates.” Gishen v. Dura Corp., 362 Mass. 117, 183 (1972).
Count I of the plaintiff s complaint cannot survive.
Count II seeks damages for alleged unjust enrichment. Such a recovery cannot survive either because there exists a valid, enforceable contract, the 2000 Agreement. Kennedy v. B.A. Gardetto, Inc., 306 Mass. 212, 216 (1940); Whiting v. Sullivan, 7 Mass. 107 (1810). See also Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250 (1993); Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85 (1956). Recovery in quantum meruit presupposes that no valid contract covers the subject matter of the dispute. MCI WorldCom Communications, Inc. v. Dep’t of Telecommunications and Energy, 442 Mass. 103, 116 (2004).
Count II of the plaintiffs complaint shall be dismissed.
Count III seeks declaratory relief principally relating to the non-competition provision of the 2000 Agreement. The parties did not brief or argue those issues and, therefore, the Court takes no action thereon.
ORDER
For the foregoing reasons, the Defendant’s Motion for Summary Judgment Based on Plaintiffs At-Will Employment, Paper #17, is ALLOWED as to Count I and Count II of the complaint.
The parties are requested to contact the Court regarding the issues relating to trial on Count III and the defendant’s counterclaim.

 $ 194,304 of the total amount is said by Tomer to be for commissions earned in 1998 and 1999 that had not been paid because of an accounting error.

 Both parties refer to these numbers as “profits.” The Court will accept their statements for purposes of the present motion, but has some suspicion that what the parties were referring to was gross revenue rather than profits.

 An employment contract that is at-will can be terminated by either side at any time for almost any reason. Pollen v. Aware, Inc., 53 Mass.App.Ct. 823, 827 (2002).

 “We’re just trying to stay alive and survive in a recession,” was how Tomer characterized his view of the situation in his deposition.