AMERICAN LEASE INSURANCE
AGENCY CORPORATION,
Plaintiff,

v.

BALBOA CAPITAL CORPORATION,
Defendant and Counterclaim
Plaintiff

v.

A.I. Credit Consumer Discount Company and Balboa Life & Casualty Company, Third–Party Defendants and Counterclaim Plaintiffs.

No. 07–cv–30232–MAP.

United States District Court,
D. Massachusetts.

July 29, 2008.

Michael R. Christy, Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, Third–Party Defendants and Counterclaim Plaintiffs.

James C. Donnelly, Jr., Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, for Plaintiff.

Alan A. Heller, Heller, Horowitz & Feit, P.C., New York, NY, William B. Scarpelli, Morrison Mahoney LLP, Jeffrey Scott Siegel, Mark M. Whitney, Morgan, Brown & Joy LLP, Boston, MA, for Defendant and Counterclaim Plaintiff.

## MEMORANDUM AND ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

### (Dkt. Nos. 23 & 57)

PONSOR, District Judge.

### I. INTRODUCTION

This case involves a contract dispute among four separate companies: Plaintiff American Lease Insurance Agency Corp. ("ALI"), Defendant (and Counterclaim Plaintiff) Balboa Capital Corp. ("BCC"), and Third–Party Defendants A.I. Credit Consumer Discount Co. ("AICCDC") and Balboa Life & Casualty Co. (parent to Balboa Insurance Co. ("Balboa Insurance")).[1] These entities are parties to a set of insurance agreements which BCC elected to terminate in November 2007. BCC's decision led to the current dispute over whether it has properly complied with the contractual conditions limiting its ability to end insurance policies already issued as part of the parties' arrangement. ALI and AICCDC have now moved for summary judgment on their various claims and counterclaims, seeking to prevent BCC from canceling its existing insurance coverage. (Dkt. No. 23, Mot. of ALI and AICCDC for Summ. J.) BCC has filed its own cross-motion for summary judgment against ALI and AICCDC, urging the court to dismiss their claims and affirm BCC's right to terminate its coverage and be refunded any unearned premiums. (Dkt. No. 57, Cross–Mot. of BCC for Summ. J.) For the reasons stated below, ALI's and AICCDC's motion for summary

---

1. The similar names of BCC and Balboa Insurance are coincidental, stemming from their mutual geographic location on an island in southern California, and not indicating any relationship between the two companies. (Dkt. No. 25, Rule 56.1 Statement of Undisputed Material Facts Submitted by ALI and AICCDC in Supp. of Mot. for Summ. J. ¶ 9.)

judgment will be denied and BCC's motion will be allowed.

## II. *FACTS*[2]

BCC is a supplier of equipment lease financing services to commercial lessees. BCC requires its customers to obtain insurance on their leased equipment, with BCC named as the loss payee and additional insured. If they do not do so independently, BCC itself arranges for the required lease insurance, charging the lessee an insurance fee (the "insurance charge") to cover the premium costs and associated expenses.

As of October 2, 2006, ALI assumed the responsibility for setting up this default insurance, providing insurance program services in cooperation with Balboa Insurance, for which ALI acts as a general agent. (Dkt. No. 70, Ex. B, Original Program Agreement.) ALI's responsibilities include communicating with lessees regarding the insurance requirement, processing evidence of other coverage independently obtained by the lessee, monitoring compliance with criteria set for such other coverage, and issuing coverage on behalf of Balboa Insurance where necessary. Individual coverage for BCC's lessees is granted under a blanket Insurance Policy outlined in a separate document. (Dkt. No. 70, Ex. C, Leased Equipment Insurance Policy ("Insurance Policy").)

After a six-month trial period, the parties renewed the Program Agreement on April 2, 2007. (Dkt. No. 70, Ex. G, Amended and Restated Program Agreement ("Program Agreement").) The 2007 contract was to extend for successive one-month terms, with BCC having the option to terminate the agreement by giving notice at least ten days prior to the expiration of a term. (Dkt. No. 68, Second Byrne Aff. ¶¶ 5, 6.)

AICCDC provides the financing for this arrangement, under a Finance Agreement with BCC. (Dkt. No. 70, Ex. D, Original Finance Agreement; Dkt. No. 70, Ex, H, Amended and Restated Finance Agreement ("Finance Agreement").[3]) The Finance Agreement establishes that AICCDC will advance to ALI the necessary insurance premiums and insurance manager fees. BCC then pays AICCDC back by giving it the insurance charges paid by the lessees. This mechanism allows BCC to avoid dedicating any capital to maintaining this insurance, since AICCDC finances the necessary premiums until BCC can collect the insurance charges from the lessees. In return for this service, AICCDC receives a monthly payment known as the "FINCO" charge. (Finance Agreement § 5.)

To facilitate the operations among these companies, BCC is contractually designated as a subcontractor to ALI and AICCDC with the obligation to transfer data to them regarding the status of lessees and to bill for and collect insurance charges from the covered lessees. (Program Agreement § 3; Finance Agreement § 4.)

The Program Agreement, Finance Agreement, and Insurance Policy all set out express conditions regarding termination of the parties' arrangement. The Program Agreement provides that either BCC or ALI may terminate the agreement without cause by providing ten days' written notice. (Program Agreement § 21(b).)

---

2. The three parties actively involved in this dispute, ALI, AICCDC, and BCC, have submitted a Joint Stipulation of Undisputed Material Facts, from which the court draws this factual background. (Dkt. No. 70.)

3. Like the Program Agreement, the original Finance Agreement was superseded by an amended version on April 2, 2007 after an initial trial period.

Should either party choose to do so, any already issued coverage remains in effect:

> In the event of such termination, [BCC] agrees that all Coverage effective prior to termination shall remain in effect with [Balboa Insurance]. [ALI] shall not thereafter cancel Coverage with respect to any Lease of Equipment that is subject to Coverage at the time of termination of this Agreement, except as provided in this Agreement or the Insurance Policy.

(*Id.*)

Similarly, the Finance Agreement allows either AICCDC or BCC to terminate it with ten days' written notice, though providing that "this Agreement shall continue in full force and effect with respect to Leases which remain subject to Coverage at the time of termination." (Finance Agreement § 14.) "Whenever any party notifies the other party of the termination of [the] Agreement," AICCDC is to refund BCC the unearned portion of the insurance charges paid by BCC for then-existing coverage, while BCC is to pay AICCDC any earned but not yet remitted insurance charges. (*Id.*)

Part V of the Insurance Policy speaks specifically to the cancellation of individual coverage. Should BCC terminate the policy (by means of ninety days' written notice), coverage already in effect "will remain in effect until individually cancelled as provided in" Part V.1, which provides for cancellation where ALI is notified that "there is other specific insurance on the individual Covered Equipment that meets all the requirements in [BCC's] lease agreement, as determined by [BCC]." (Insurance Policy pts. V.1.a, V.1.b, V.2.) Where other coverage is provided and the Balboa Insurance policy is cancelled, the related unearned premiums are to be refunded to BCC. (*Id.*)

The Program Agreement also has a provision regarding cancellation of individual insurance policies. It states that ALI should notify Balboa Insurance to cancel its coverage under several circumstances, including if "any Lessee provides satisfactory evidence of Other Coverage," and that upon cancellation, Balboa Insurance and ALI are to refund any paid but unearned premiums and insurance manager policy fees to AICCDC, which is then to refund those amounts to BCC. (Program Agreement §§ 9(a)(I), (b).) "Other Coverage" is defined as "insurance coverage procured by any Lessee that satisfies the criteria referred to in Section 15." (*Id.* § 1.)

Section 15 in turn provides that BCC and ALI are to formulate a written list of criteria defining "Other Coverage Criteria," (*id.* § 15), which the parties accordingly did in a document executed March 5, 2007. (Dkt. No. 70, Ex. E, Other Coverage Criteria.) Under that agreement, "[a] customer may provide evidence of sufficient Other Coverage on any leases" by email, fax, or mail. (*Id.*) The document requires certain specific information to be furnished to ALI as evidence of other coverage on all new leases, including "Evidence of Property Insurance with 'special form' including theft, sufficient to cover the original amount financed (using ACORD 28 or its equivalent) [or] a Certificate of Property Insurance (ACORD 24 or its equivalent)," as well as proof of BCC "as the 'loss payee' on a Lender's Loss Payable endorsement (ISO form BP 12 03 or CP 12 18 or their equivalent)."[4] (*Id.*)

According to ALI and AICCDC, the clauses providing for the continuation of

---

4. The final section of the document, relating to "Existing Leases," concerns leases pre-dating the Program Agreement and is not relevant to the cancellation of coverage issued during the life of the program. (Dkt. No. 40, Mem. of ALI and AICCDC in Supp. of Mot. for Specific Performance and/or TRO & Prelim. Inj. 16 n. 42.)

coverage despite termination of the parties' agreements are meant to ensure that they receive proportional compensation for their efforts under these contracts. Apparently the majority of the time and expense that ALI and AICCDC put into financing and managing BCC's insurance is "front-loaded," occurring within the first six months of when an individual policy becomes effective, while their right to keep their compensation for that effort is prorated uniformly over the duration of the lease (which usually extends three to five years). (Insurance Policy pt. V.4.) Thus, if a lease is cancelled prematurely, ALI and AICCDC are likely to have invested more time and money than will be accounted for by the compensation they have accrued up to that point. (Dkt. No. 25, Rule 56.1 Statement of Undisputed Material Facts Submitted by ALI and AICCDC in Supp. of Mot. for Summ. J. ¶¶ 20–22.)

Once the parties' arrangement was implemented, around half of BCC's lessees chose not to obtain their own insurance coverage, but instead accepted the default coverage from Balboa Insurance. On November 1, 2007, BCC, having found an another insurance company willing to handle the entire program itself at a lower cost, notified ALI and AICCDC by letter that it wished to terminate the Program and Finance Agreements without cause. Soon after, BCC indicated to ALI that it would obtain insurance from another provider and would cancel all the policies provided by Balboa Insurance once the alternative policies were in place. On November 26, 2007, BCC sent ALI separate cancellation notices for each of its 1,452 covered lease agreements in order to cancel existing coverage effective January 15, 2008. ALI formally rejected those notices

on November 26, 2007, arguing that section 9 of the Program Agreement and related provisions in the parties' other agreements would not allow BCC to unilaterally cancel all of its lessees' pre-existing coverage, but rather would permit only individual lessees to cancel their insurance on their own initiative.

ALI filed this action against BCC on November 27, 2007, seeking a declaratory judgment confirming its interpretation of the Program Agreement. (Dkt. No. 1, Compl.; Dkt. No. 3, Am. Compl.) In response, BCC brought several counterclaims against ALI, AICCDC, and Balboa Insurance in January 2008, petitioning for a declaratory judgment affirming the validity of its cancellation and mandating the return of unearned premiums it paid for the terminated insurance (Counterclaim I), an additionally charging breach of contract (Counterclaim II) and unjust enrichment (Counterclaim III). (Dkt. No. 6, Answer to Am. Compl. for Declaratory J. and Countercls. 7–10.) AICCDC has in turn brought claims against BCC for declaratory judgment regarding the interpretation of the parties' agreements (AICCDC Count I) and for breach of contract (AICCDC Count II), seeking specific performance and equitable relief.[5] (Dkt. No. 20, AICCDC's Reply to Countercls. and Compl. Against BCC ¶¶ 40–45.)

After ALI began this litigation, the parties maintained the status quo, with BCC holding off on immediate cancellation of its lessees' coverage with Balboa Insurance in hope of settlement. However, on April 9, 2008, BCC stopped processing the scheduled bimonthly data transfers to ALI and AICCDC regarding insurance charges it had collected from its covered lessees since

---

**5.** AICCDC designates its request for specific performance and equitable remedies as a separate Count III. This claim mainly relates to a motion for preliminary relief that was denied on May 30, 2008, and thus even if it is an independent claim it has already been disposed of by the court.

the last such data transfer. BCC has gone forward with the cancellation because its replacement insurer predicated certain offered pricing concessions on BCC transferring the Balboa-insured leases by a certain date. (Dkt. No. 53, First Byrne Aff. ¶ 11.). Although BCC has at this point switched its coverage to the alternative insurer, ALI has not provided data to Balboa Insurance to allow it to calculate the appropriate refund of unearned premiums, nor has ALI refunded its unearned commissions to AICCDC, BCC, or Balboa Insurance.

ALI and AICCDC regarded BCC's behavior as a material breach of the Program and Finance Agreements, which appoint BCC as a subcontractor responsible for collecting and transmitting the data necessary for ALI to calculate the net insurance charge payments owed by BCC, as well as remitting the correct insurance charges to AICCDC. (Program Agreement §§ 1, 3, 10; Finance Agreement § 4.) They therefore filed a motion for a preliminary injunction requiring BCC to resume the data transfers and otherwise fulfill its subcontractor obligations under the Program and Finance Agreements. (Dkt. No. 39.) The court denied that motion at a hearing on May 30, 2008 for a failure to show irreparable harm, without any ruling as to the merits of the parties' dispute. (Dkt. No. 67.)

Now before the court are the parties' cross-motions for summary judgment, which focus on the proper interpretation of their contracts, in addition to raising the issue of whether ALI violated New York insurance regulations by failing to disclose the amount of its commissions from the insurance premiums to BBC. (Dkt.Nos.23, 57.)

### III. *DISCUSSION*

Summary judgment may be granted where the record "show[s] that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue is one that a reasonable fact-finder could decide either way. *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir.2003) (citation omitted). Any disputed fact must be construed in the light most favorable to the non-movant. *Id.* "This framework is not altered by the presence of cross-motions for summary judgment." *Id.*

#### A. *Interpretation of the Agreements.*

The central issue in this case is the proper interpretation of the agreements among ALI, AICCDC, and BCC. ALI and AICCDC contend that the provisions reviewed above allow insurance coverage existing at the time of termination to be cancelled only at the initiative of individual lessees, as part of a framework meant to ensure that ALI and AICCDC are fairly compensated over the life of a policy for the effort they put in when it is first issued. BCC meanwhile views the termination provisions as simply a bridging mechanism meant to ensure continuing coverage until an adequate policy from a new insurer is in place.

■ Both the Program and Finance Agreements have choice-of-law provisions selecting New York law to govern their interpretation. (Program Agreement § 25; Finance Agreement § 15.) In interpreting a written contract, New York law requires the court "to determine the intention of the parties as derived from the language employed in the contract, . . . . striv[ing] to give a fair and reasonable meaning to the language used." *Abiele Contracting, Inc. v. N.Y. City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9–10, 666 N.Y.S.2d 970, 689 N.E.2d 864 (N.Y.1997). The first step is to determine whether the contract is ambiguous or unambiguous; to be unambiguous, the language of the agreement

must have "'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (N.Y.2002) (alteration in original) (*quoting Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 354, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (N.Y.1978)). Only if the plain language of the contract does not produce an exclusive reasonable interpretation may the court turn to extrinsic evidence to determine the meaning of disputed terms. *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 771 N.E.2d 240 (N.Y.2002)

Under the Program and Finance Agreements, insurance policies already existing as of the date of termination of the agreements will remain in effect until they are cancelled in accordance with the provisions of the Program Agreement or the Insurance Policy. (Program Agreement § 21(b) ("In the event of such termination, [BCC] agrees that all Coverage effective prior to termination shall remain in effect with [Balboa Insurance]. [ALI] shall not thereafter cancel Coverage with respect to any Lease of Equipment that is subject to Coverage at the time of termination of this Agreement, except as provided in this Agreement or the Insurance Policy."); Finance Agreement § 14 (allowing termination "provided, however, this Agreement shall continue in full force and effect with respect to Leases which remain subject to Coverage at the time of termination"); *see also* Program Agreement § 22 (stating that section 21 survives any termination of the agreement).) Given this plain language, the only open question is whether BCC properly cancelled its lessees' individ-

ual coverage under the Other Coverage Criteria document formulated pursuant to section 9 of the Program Agreement or under Part V.1 of the Insurance Policy.

The interpretation of the Program Agreement has been subject to heated dispute by the parties. Indeed, whether it permits cancellation of existing insurance policies by BCC or only by individual lessees themselves is eminently debatable. However, the language of the Insurance Policy is much less ambiguous.

The Insurance Policy provides that an individual's coverage will be cancelled if ALI is notified "that there is other specific insurance on individual Covered Equipment that meets YOUR [that is, BCC's] lease agreement requirements, as determined by YOU." [6] (Insurance Policy pts. V.1.a, V.1.b.) On its face, that open-ended language allows BCC to decide on its own that a lessee's coverage under a new insurer is sufficient and then notify ALI of that determination in order to instigate cancellation.

ALI contends that this language simply refers to BCC's role in coming up with the Other Coverage Criteria by which the sufficiency of alternative coverage is judged under the Program Agreement. That reading is not a reasonable interpretation of the Insurance Policy. The statement that cancellation is to occur once ALI is notified of alternative coverage that meets "YOUR lease agreement requirements, as determined by YOU" denotes lease agreement requirements *as determined by BCC alone*, a description that does not fit the Other Coverage Criteria, which are the result of mutual agreement between BCC and ALI. (Program Agreement § 15.)

Furthermore, if the Insurance Policy's cancellation provision simply referred back

**6.** The Insurance Policy states that "[t]hroughout this policy, the words 'YOU,' 'YOUR,' and 'YOURS' refer to the Insured Lessor shown above in the Policy Declarations"—in this case, BCC. (Insurance Policy 1–2.)

to the Program Agreement's mechanism, then the Insurance Policy would simply operate as a replica the Program Agreement, rendering superfluous the choice between canceling under either document set out in section 21(b) of the Program Agreement. *See Robert J. McRell Assocs., Inc. v. Ins. Co. of N. Am.*, 677 F.Supp. 721, 727 (S.D.N.Y.1987) ("New York contract law requires ... that each provision of a contract should be read to give reasonable and effective meaning to all its terms, so as to avoid leaving any particular provision without any effect or purpose.") (*citing Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985)). The only reasonable interpretation of Parts V.1.a and V.1.b is that they rest the basic determination as to the sufficiency of alternative insurance coverage in the hands of BCC, with ALI's role simply to be notified of a cancellation and to transmit that information to Balboa Insurance.[7]

The court therefore need not reach the tangled question of the correct interpretation of the termination provisions of the Program Agreement. The Insurance Policy unambiguously allows BCC to cancel its lessees' insurance coverage with ALI and AICCDC, in a valid alternative to the Program Agreement's mechanism.[8]

B. *New York Insurance Law.*

█ BCC attempts to raise a new issue on summary judgment: the allegation that ALI violated New York insurance law by failing to disclose to BCC the basis for, and amount of, the commissions it earned as part of this insurance arrangement as required under N.Y. Ins. Laws § 2119(c)(1). Even if this argument had been properly raised in the pleadings, BCC's contention would fail on the merits, both because section 2119 mandates disclosure of fees only to the party paying them—in this case, Balboa Insurance, not BCC—and because that provision only applies to contracts made or negotiated in the state of New York, whereas the agreements here were made in California.

## IV. CONCLUSION

For the foregoing reasons, ALI's and AICCDC's motion for summary judgment (Dkt. No. 23) is hereby DENIED and BCC's motion for summary judgment (Dkt. No. 57) is hereby ALLOWED on all counts of the complaint and on Count I of its counterclaim seeking a declaratory judgment. These rulings leave outstanding Count II (breach of contract) and Count III (unjust enrichment) of BCC's counterclaim, and Count I of its Third–Party Complaint. No final judgment may enter until these causes of action are addressed. On or before August 22, 2008, BCC will report to the court about how it intends to proceed regarding these causes of action. By the same date, BCC may

---

**7.** Part V.2 does not add much to this interpretation. It provides that if BCC cancels the insurance policy, "coverage on Covered Equipment issued prior [to] the effective date of cancellation of this Policy will remain in effect until *individually* cancelled as provided in Section V, paragraph 1 above or until termination of each lease agreement." (*Id.* pt. V.2 (emphasis added).) That phrasing might reinforce the position that cancellation must be by an individual lessee, but it is not clear that "individually cancelled" necessarily refers to the cancellation of coverage by individuals rather than the cancellation of individual policies, another plausible reading.

**8.** Holding that the Insurance Policy is unambiguous precludes the court from considering the affidavit by the president of ALI testifying that during the discussion of notice of termination, he mentioned to BCC's president that coverage in effect on the date of termination would continue until the lease expired or coverage was otherwise terminated in accordance with the Program Agreement. (Dkt. No. 66, Fifth Dinkelaker Aff. ¶ 2(e).)

submit its motion for attorneys' fees, if any.

It is So Ordered.