# United States Court of Appeals
## For the First Circuit

No. 19-1233

KEISUKE SUZUKI,

Plaintiff, Appellant,

v.

ABIOMED, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

William T. Harrington, with whom Christine A. Maglione and Harrington Law, P.C. were on brief, for appellant.
Kenneth M. Bello, with whom Alexandra D. Thaler and Bello Welsh LLP were on brief, for appellee.

November 27, 2019

**SELYA**, **Circuit Judge**. This case involves a claimed breach of the implied covenant of good faith and fair dealing brought by a former executive who contends that his quondam employer, a producer of heart pumps, terminated his employment, allegedly to deprive him of a sizable equity incentive. Because the plaintiff has failed to present sufficient evidence that this equity incentive constituted compensation already earned by virtue of his past work under state law, we affirm the district court's entry of summary judgment in the defendant's favor. The tale follows.

## I. BACKGROUND

We rehearse the facts and travel of the case, viewing those facts in the light most flattering to the summary judgment loser (here, the plaintiff). See Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 852 (1st Cir. 2016). Defendant-appellee Abiomed, Inc. designs, manufactures, and markets temporary mechanical circulatory support devices, including the Impella line of heart pumps. In early 2009, plaintiff-appellant Keisuke Suzuki started consulting with Abiomed about the company's efforts to secure Japanese regulatory approval for its Impella devices. The approval process involves the submission of an application — known as the Shonin application — to Japan's Pharmaceutical and Medical Device Agency (PMDA). Submission of the Shonin application typically is followed by various tests, audits, and expert panel reviews.

Thereafter, the PMDA makes a recommendation to the so-called Upper Panel of Japan's Ministry of Health, Labour and Welfare (MHLW). Once the Upper Panel's review is complete, the MHLW announces its final decision regarding approval.

In April of 2010, Suzuki began to work full-time as Abiomed's vice-president of Asia — a position in which he assumed primary responsibility for shepherding the Impella devices through the Japanese regulatory approval process. His employment was memorialized by an offer letter and a nondisclosure agreement. In addition to a base salary, an annual bonus potential, and a commission opportunity, the offer letter outlined three equity awards to be paid upon the achievement of certain milestones en route to regulatory approval: first, the issuance of 10,000 shares of Abiomed common stock upon the submission of the Shonin application; second, the issuance of 20,000 shares "when the MHLW approve[d] Impella for general use"; and third, the issuance of 15,000 shares when Abiomed gained "[a]pproval for [the] targeted reimbursement level of Impella."

Withal, the offer letter contained several caveats. To begin, it stated that in order to receive the equity awards, Suzuki must be actively employed by Abiomed when the relevant milestone was achieved. Additionally, Abiomed "reserve[d] the right on a prospective basis to modify, change or eliminate its [c]ompensation, [b]onus or [b]enefit programs." Last but not

- 3 -

least, the offer letter admonished that it was not to be "construed as an agreement, either express or implied, to employ [Suzuki] for any stated term," and it in no way altered Abiomed's policy "under which both [Suzuki] and [Abiomed] remain[ed] free to end the employment relationship at any time and for any reason."

On the advice of a friend who was also an attorney, Suzuki requested the insertion of a provision to the effect that if his employment was terminated without cause, he would retain "the right to claim the equity" as long as a particular milestone was achieved "within 6 months of [his] departure, as the majority of the work would be done before that." Suzuki added that a provision allowing him to claim the equity if a milestone was achieved within three months after his dismissal would also be "reasonable." Frank LeBlanc, Abiomed's chief human resources official, responded that Abiomed declined to accommodate this request, as its policy with respect to event-based equity incentives entailed "grant[ing] those shares only after the event has occurred, and only to active employees." Suzuki backed off, replying: "Fair enough. I had to ask." He proceeded to sign the offer letter that same day.

Eight days later, Suzuki executed the nondisclosure agreement. This agreement provided, in pertinent part, that Abiomed could terminate Suzuki's employment at any time with or without cause during the first six months of his tenure.

Thereafter, Abiomed could discharge him without cause only upon twenty-eight days' written notice. Relatedly, the agreement allowed Suzuki to resign his employment without cause at any time upon twenty-eight days' written notice.

Around the same time that he assumed his new role, Suzuki estimated that the Shonin application would be submitted by August of 2010 and that approval of the Impella devices would take approximately two years. These predictions proved overly optimistic, and it was not until late March of 2011 that Abiomed submitted the Shonin application and (in accordance with the 2010 offer letter) issued 10,000 shares of its common stock to Suzuki. Between 2011 and 2014, Suzuki and his co-workers responded to well over one hundred questions posed by the PMDA. During this period, Suzuki's projected timeline for approval shifted. In periodic presentations to Abiomed executives between 2011 and 2013, Suzuki indicated that approval would occur in one to two years. On at least two occasions, Suzuki intimated to colleagues that the PMDA was poised to approve the Impella devices — but approval nonetheless remained elusive.

The parties hotly dispute the reasons for this sluggish pace. Suzuki maintains that Abiomed failed to prioritize the Japanese approval effort, while various Abiomed executives stated in depositions and affidavits that Suzuki's caustic style and aggressive tactics stunted progress. This criticism does not

- 5 -

appear to have come out of thin air: the record contains ample uncontroverted evidence of abrasive e-mails from Suzuki to Abiomed executives, together with evidence that Suzuki stormed out of at least three meetings with colleagues during his five-year tenure. Equally concerning, Abiomed learned in January of 2015 that Yoshimasa Yokoyama, the PMDA's lead reviewer of Abiomed's Shonin application, had reported that "bad rumors" were circulating about Suzuki. These rumors depicted Suzuki as telling a "biased story" about the Impella devices, "blaming PMDA for delay," and recruiting Japanese physicians to pressure regulators for approval (a tactic that Suzuki asserts he undertook with the blessing of senior management).

Shortly after learning about Yokoyama's concerns, Abiomed encountered several new roadblocks on the path to regulatory approval. For one thing, Suzuki informed Abiomed executives that the PMDA would postpone an in-person meeting (the Menkai meeting) planned for the end of January. Andrew Greenfield, Abiomed's vice-president of healthcare solutions, was told that the PMDA delayed this meeting because it was continuing to assess issues related to the Shonin application. For another thing, in February of 2015, Suzuki informed Abiomed executives that the PMDA was requesting information about the distinctions between various versions of the 2.5 and 5.0 Impella models — questions that Suzuki believed would generate a significant amount of work. By that

spring, some of Suzuki's correspondence contained glimmers of doubt about the prospects for approval.

Abiomed executives weighed Suzuki's future with the company, including the possibility of terminating his employment, as early as April of 2014. An e-mail exchange from September of 2014 between Greenfield and Abiomed's chief executive officer, Michael Minogue, indicates that the two thought a "change" was necessary because Suzuki's caustic communication style had "gotten worse," despite "multiple discussions about [the] behavior." The matter simmered, however, until the following year.

On May 14, 2015, the pot came to a boil. Greenfield met with Suzuki and told him that Abiomed intended to change his duties and compensation structure, given Suzuki's failure to secure approval of the Impella devices despite a five-year run-up. The following week, Greenfield delivered Suzuki's annual performance review, again telling Suzuki that his failure to achieve approval necessitated a changed role. This time, though, Greenfield added that Suzuki would not receive an annual bonus. In the self-assessment portion of this performance review, Suzuki gave himself the lowest ranking possible in the category of achieving approval, stating: "Bottom line, [I] was not able to gain approval."

On May 20, Greenfield sent Suzuki a letter offering him continued employment in a new role and with an altered compensation structure. Under this proposal, Suzuki would serve as an

individual contributor "focused specifically on regulatory milestones in Japan" rather than as the vice-president of Asia with (at least nominally) a broader portfolio. The letter provided that any outstanding equity incentives from Suzuki's existing employment arrangement would be replaced with two opportunities for awards of restricted stock units (RSUs): first, an award of 10,000 RSUs upon the MHLW's approval of the Impella devices "for general use in Japan"; and second, an award of 5,000 RSUs for approval of the "targeted reimbursement level of Impella." Half of each award would vest upon the occurrence of the specified milestone and the other half would vest on the first anniversary of that milestone's achievement, provided that Suzuki continued to be employed by Abiomed at those times. In addition, the letter made clear that all of the specified milestones would have to be completed within eighteen months of Suzuki's signature.

Two days later, Greenfield sent Suzuki a revised letter. This second letter mirrored the first in most pertinent respects, but it revised the number, amounts, and wording of the proposed equity incentive awards. It also contained a stipulation, which stated that the "aggregate total value of all grant rewards may not exceed $500,000 USD."

On May 26, Suzuki sent Greenfield a "counter" proposal, rejecting the terms suggested by Greenfield but acknowledging that "changes [were] necessary to improve the limited progress achieved

toward resolution of outstanding PMDA approval items." Suzuki expressed his concern that the "whole purpose" of Greenfield's suggestion was to renege on "the original deal between [Suzuki] and the company, as the value of the equity [has] risen far beyond what the company [had] foreseen" in 2010.[1] On June 3, Greenfield informed LeBlanc that he intended to terminate Suzuki's employment by the middle of the month. In Greenfield's view, Suzuki's failure to achieve regulatory approval rendered his impending dismissal "for cause." Greenfield scoffed at Suzuki's assertion that the suggested revision of Suzuki's role was "intended to deprive [Suzuki] of equity," observing that Suzuki "clearly does not understand that he has no entitlement to the other equity as he has not achieved 2 out of the 3 milestones."

The Menkai meeting between Abiomed and the PMDA took place on June 9, 2015. The parties agree that Suzuki had at least "some involvement" in setting up the meeting. William Bolt, Abiomed's senior vice-president of global product operations, served as its primary spokesman, although Suzuki was in attendance. The meeting proved productive but not definitive. The PMDA

---

[1] Abiomed's common stock was selling for $10.00 per share at the time Suzuki began his full-time employment in 2010. By May of 2015, the stock price had climbed to $68.30 per share. When Suzuki's employment was terminated in June of 2015, the per-share price was $67.16. That price brought the potential value of the 20,000 shares promised upon achievement of the second milestone to $1,343,200.00.

indicated that it would not require Abiomed to split its Shonin application between the Impella 2.5 and 5.0 models. Moreover, the PMDA clarified that it would not require Abiomed to undergo a human clinical study. Both of these developments promised to save Abiomed significant work and resources. Even so, the PMDA did not guarantee ultimate approval of the Impella devices but, rather, made pellucid that Abiomed would need to conduct additional tests, pass muster with another expert panel, and revise the Shonin application to reflect the most current versions of the Impella pumps.

Several of Suzuki's e-mails, sent in the wake of the Menkai meeting, reflect his concern that regulatory approval might be significantly delayed. In one e-mail, Suzuki stated that it would be "very challenging" for Abiomed to achieve approval by the end of March of 2016, given the PMDA's insistence that Abiomed go before another expert panel. A separate e-mail expressed Suzuki's doubts about Abiomed's chances of securing approval by April of 2016: "My sense is that if we cannot deliver by year end, then we will miss the boat again . . . . PMDA will drop the towel, and we will be asked to withdraw . . . ."

On June 15, 2015, Suzuki e-mailed Minogue, Greenfield, and Bolt, declaring that he had "vested rights in the 20,000 shares" set forth in the 2010 offer letter both because he was responsible for the "positive outcome" of the Menkai meeting and

because he had "executed substantial performance" toward obtaining approval of the Impella devices. Bolt privately debunked Suzuki's suggestion that approval was imminent, writing to Greenfield and LeBlanc that "[t]here is a lot that needs to occur, and to go well, in order for us ultimately to get PMDA approval." Greenfield responded to Suzuki on June 17, stating that although the Menkai meeting had been productive, approval was not "virtually guaranteed," and the meeting could not be regarded as a "home run." At best, Greenfield wrote, approval remained "many months away (likely well into 2016)." Thus, Suzuki "really need[ed] to decide whether [he] want[ed] to continue working with Abiomed in a capacity where [he could] contribute to the regulatory approval effort, but on terms that are reasonable and [that] the Company is prepared to offer."

Suzuki and Greenfield met the next day. Suzuki reiterated that he would not accept Greenfield's suggested terms of continued employment. Greenfield rejoined by terminating Suzuki's employment on the spot, without giving him twenty-eight days' written notice. Nor did Abiomed pay Suzuki for an additional twenty-eight days until after suit was commenced. And it did not contemporaneously inform Suzuki that his ouster was for cause.

Abiomed finally gained Japanese regulatory approval for the Impella devices' use for "drug resistant acute heart failure, such as cardiogenic shock" on September 27, 2016. The parties

dispute whether this approval was for "general use" of the Impella devices as that term was used in the 2010 offer letter. It is undisputed that Abiomed completed at least some additional work during the fifteen months between Suzuki's firing and the obtaining of regulatory approval. Such additional work included conducting new tests, submitting supplemental data, and answering regulators' recurring questions.

In late 2016, Suzuki repaired to the United States District Court for the District of Massachusetts. Invoking diversity jurisdiction, see 28 U.S.C. § 1332(a), he sued Abiomed on an array of theories. He eventually abandoned all but one of his claims[2]: his claim for breach of the implied covenant of good faith and fair dealing. After the close of discovery, Abiomed moved for summary judgment. Following briefing and oral argument, the district court granted Abiomed's motion, see Suzuki v. Abiomed, Inc., No. 16-12214-DJC, 2019 WL 109340, at *12 (D. Mass. Jan. 4, 2019), concluding that Suzuki had not presented sufficient evidence to show either that he was on the brink of achieving the second milestone at the time of his discharge or that the 20,000

---

[2] Suzuki voluntarily dismissed a claim for retaliation under the Massachusetts Wage Act, see Mass. Gen. Laws ch. 149, § 148A, as well as that portion of his breach of contract claim alleging Abiomed's failure to provide him twenty-eight days' written notice of termination. He later declined to oppose summary judgment with respect to his promissory estoppel and quantum meruit claims, and the district court entered judgment against him on those claims. None of these claims is presently before us.

shares associated with that milestone comprised compensation that he had fairly earned and legitimately expected by virtue of his past work, see id. at *11.  This timely appeal ensued.

## II. ANALYSIS

We review the district court's entry of summary judgment de novo.  See Flovac, Inc., 817 F.3d at 852.  Summary judgment may be granted only if examination of the record in the light most congenial to the nonmovant reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Faiella v. Fed. Nat'l Mortg. Ass'n, 928 F.3d 141, 145 (1st Cir. 2019).  A plaintiff opposing summary judgment bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011) (quoting Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003)).  With this rudimentary foundation in place, we turn to the analytic framework that governs Suzuki's claim for breach of the implied covenant of good faith and fair dealing.  We then proceed to the merits of his claim.

### A. The Analytic Framework.

We pause at the threshold to untangle the jurisprudential strands that run through application of the implied covenant of good faith and fair dealing in the employment context.  Inasmuch as this case is founded on diversity

jurisdiction, state law supplies the substantive rules of decision. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Potvin v. Speedway LLC, 891 F.3d 410, 414 (1st Cir. 2018). The parties agree that Massachusetts law controls, and we accept their reasonable agreement. See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991).

In Massachusetts, every contract is subject to an implied covenant of good faith and fair dealing "to some extent." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 683 (Mass. 2005). Generally speaking, this implied covenant provides that neither party to a contract "shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 95 N.E.3d 547, 560 (Mass. 2018) (quoting Weiler v. PortfolioScope, Inc., 12 N.E.3d 354, 361 (Mass. 2014)). A breach of the covenant occurs when one party to a contract "violates the reasonable expectations of the other." Id. (quoting Weiler, 12 N.E.3d at 362).

Employers have been found liable under the implied covenant in "varying contexts and subject to strict limitations." Ayash, 822 N.E.2d at 684. Of particular pertinence for present purposes, the Massachusetts Supreme Judicial Court (SJC) has held "that an employer is accountable to a discharged employee for unpaid compensation if the employee [was] terminated in bad faith

- 14 -

and the compensation is clearly connected to work already performed." Harrison v. NetCentric Corp., 744 N.E.2d 622, 629 (Mass. 2001) (citing Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251, 1257 (Mass. 1977)). In this context, the paradigmatic example of bad faith occurs when an employer seeks to avoid the payment of earned compensation by discharging an employee who is "on the brink of successfully completing" a sale or some other milestone that will trigger entitlement to the disputed compensation. Fortune, 364 N.E.2d at 1257; accord Maddaloni v. W. Mass. Bus Lines, Inc., 438 N.E.2d 351, 356 (Mass. 1982).

In Gram v. Liberty Mutual Insurance Co., 429 N.E.2d 21, 27-29 (Mass. 1981) (Gram I), the SJC extended the Fortune doctrine to circumstances in which an at-will employee is discharged without good cause (but absent any showing of bad faith). Although termination of employment without good cause is not alone a breach of the implied covenant, an employer may sometimes be held liable for lost compensation if that compensation is "clearly related" to the dismissed employee's "past service." Id. at 28-29. The SJC has cautioned, however, that the recovery permitted in Gram I "pressed to the limit the recovery allowed to an at-will employee discharged without cause." Gram v. Liberty Mut. Ins. Co., 461 N.E.2d 796, 798 (Mass. 1984) (Gram II).

In the case at hand, the district court deemed Suzuki an at-will employee and examined his implied covenant claim

- 15 -

exclusively through the lens of the Fortune/Gram doctrine. See Suzuki, 2019 WL 109340, at *8-9, 8 n.8. Suzuki objects to both determinations. Pointing to the nondisclosure agreement's stipulation that, once he had been working for six months, Abiomed could fire him without cause only upon twenty-eight days' written notice, Suzuki contends that Abiomed was obligated to employ him for a definite term (twenty-eight days), thus removing him from the at-will employment realm and, by extension, the Fortune/Gram framework.[3] As a corollary, Suzuki submits that he can prevail by showing — under the standards normally applicable to implied covenant claims brought outside the at-will employment context — that Abiomed engaged in "unfair leveraging" and violated his "reasonable expectations" by pressuring him to accept a revised employment arrangement and then dismissing him when he refused (all for the illicit purpose of depriving him of the bargained-for equity incentives).

We need not decide whether Suzuki was an at-will employee under Massachusetts law because, in any event, his claim fits comfortably within the ambit of the Fortune/Gram doctrine. The 2010 offer letter explicitly stated that Abiomed was not obligated

---

[3] In Massachusetts, "[t]he general rule is that an at-will employee may be terminated at any time for any reason or for no reason at all." Upton v. JWP Businessland, 682 N.E.2d 1357, 1358 (Mass. 1997). Employment contracts for a "definite period" of time are therefore not at will. Willitts v. Roman Catholic Archbishop of Bos., 581 N.E.2d 475, 479 (Mass. 1991).

- 16 -

to employ Suzuki "for any stated term" and that either party was "free to end the employment relationship at any time and for any reason." Although the nondisclosure agreement — signed days after the offer letter — added a twenty-eight day notice provision for termination without cause, nothing in that agreement altered Abiomed's basic ability to discharge Suzuki with or without cause. In this critical sense, then, Suzuki's employment arrangement was indistinguishable from the sort of employment contract typically involved in Fortune/Gram cases. See, e.g., Fortune, 364 N.E.2d at 1255 (addressing employment contract that "reserved to the parties an explicit power to terminate the contract without cause on written notice").

What is more, the offer letter does not establish any for-cause termination requirement on its face, and Abiomed eventually paid Suzuki's salary for the twenty-eight days that the notice provision specified. Suzuki's claim, therefore, is only that Abiomed cashiered him to avoid paying equity incentives to which Suzuki was entitled by virtue of his past services. The Fortune/Gram framework was designed to address just such a scenario. See Maddaloni, 438 N.E.2d at 356. The presence of a written notice requirement does not make an employee any less vulnerable than the mine-run of at-will employees to the danger that an employer may use termination of employment as a means of depriving workers "of compensation fairly earned and legitimately

- 17 -

expected for services already rendered." Cochran v. Quest Software, Inc., 328 F.3d 1, 8 (1st Cir. 2003).

Finally, Suzuki has not shown that he has recourse to some species of implied covenant claim independent of the Fortune/Gram doctrine. Although the range of theories available under the implied covenant in the employment context is indistinct, the SJC has taken pains to note that employers, "in varying contexts and subject to strict limitations," have been found liable for breach of the implied covenant "only in circumstances when an at-will employee has been terminated in bad faith." Ayash, 822 N.E.2d at 684. In support of that statement, the SJC cited only cases resolved under the Fortune/Gram doctrine.[4] See id.

To be sure, the SJC (on one occasion) rejected, without elaboration, an argument that a claim for breach of the implied covenant "in the context of an employment relationship may never exist absent an allegation of a 'bad faith' termination." Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1265 n.9 (Mass. 2007).[5]

_____

[4] The SJC has permitted at-will employees to bring wrongful termination claims when their dismissal allegedly violates a clearly established public policy. See King v. Driscoll, 638 N.E.2d 488, 492 (Mass. 1994) (collecting cases); see also Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241, 1244 (Mass. 1992). Suzuki, though, has not mounted such a claim.

[5] In that case, the court examined whether an employer violated an employee's reasonable expectations under his employment agreement by adopting an informal policy discouraging participants in an employee equity participation plan from exercising their right to tender shares received pursuant to the plan. See Eigerman, 877 N.E.2d at 1260-61, 1264-65.

But we are aware of no case — and Suzuki has cited none — in which the SJC has evaluated allegations that an employer dismissed an employee for the purpose of depriving him of earned compensation under any framework other than the Fortune/Gram doctrine.[6] The precedent upon which Suzuki principally relies in arguing that Abiomed engaged in "unfair leveraging" is certainly not such a decision. See Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820-21 (Mass. 1991) (upholding finding of breach of implied covenant in the context of a commercial development agreement). Any argument that Abiomed either engaged in "unfair leveraging" or transgressed Suzuki's "reasonable expectations" under his employment arrangement is part and parcel of Suzuki's claim under the Fortune/Gram doctrine (that Abiomed fired him to avoid paying an equity incentive that he contends he had earned by virtue of his past work).

---

[6] In an unwarranted burst of optimism, Suzuki points to Williams v. B & K Medical Systems, Inc., 732 N.E.2d 300 (Mass. App. Ct. 2000). But the claim at issue in Williams is easily distinguishable. The Williams plaintiff alleged that his employer breached the employment agreement when it discharged him for allegedly pocketing excessive commissions and reimbursements, limited his severance pay, and threatened to ruin his career, not that it discharged him for the purpose of depriving him of compensation earned by virtue of his past labors. See id. at 303, 305. And perhaps more important, Williams predates the SJC's suggestion in Ayash, 822 N.E.2d at 684, that employers have been found liable under the implied covenant "only in circumstances" covered by the Fortune/Gram doctrine and "subject to strict limitations." We decline to outpace the SJC based on so slender a reed.

To sum up, we conclude that the twenty-eight-day notice provision in Suzuki's nondisclosure agreement does not pretermit application of the Fortune/Gram doctrine. So, too, we conclude that the Fortune/Gram doctrine is the sole vehicle under Massachusetts law through which Suzuki may sue his employer for allegedly violating the implied covenant of good faith and fair dealing by discharging him to work a deprivation of earned compensation. Consequently, we proceed to test Suzuki's claim exclusively in the Fortune/Gram crucible.

## B. The Merits.

This brings us to the substance of the district court's summary judgment ruling. After careful consideration, we agree with the district court, see Suzuki, 2019 WL 109340, at *11, that Suzuki has failed to present evidence sufficient to make out a genuine factual dispute about whether Abiomed deprived him of compensation he earned by virtue of past services. Under the Fortune/Gram doctrine, this failure is fatal to Suzuki's claim. We elaborate below.

No iteration of the Fortune/Gram doctrine permits recovery of "future compensation for future services." McCone v. New Eng. Tel. & Tel. Co., 471 N.E.2d 47, 50 (Mass. 1984) (quoting Gram II, 461 N.E.2d at 798). Instead, a plaintiff pursuing a Fortune/Gram claim must have been deprived of "identifiable, future benefit[s]" that are sufficiently "reflective of past

- 20 -

services." Id. (quoting Gram II, 461 N.E.2d at 797).  Put another way, such a claim is limited to "money that [the plaintiff] had fairly earned and legitimately expected" because of work already performed.  Maddaloni, 438 N.E.2d at 356.  Our case law echoes this principle.  See, e.g., Cochran, 328 F.3d at 8; Sands v. Ridefilm Corp., 212 F.3d 657, 662-63 (1st Cir. 2000); Sargent v. Tenaska, Inc., 108 F.3d 5, 7-8 (1st Cir. 1997).

In this instance, it is undisputed that, at the time of his discharge, Suzuki was not entitled to the second equity incentive under the literal terms of his employment arrangement. After all, the 2010 offer letter specified that Suzuki would only receive the 20,000 shares if his employment was still ongoing when the MHLW approved the Impella devices, and Suzuki concedes that this milestone had not yet been reached when Abiomed fired him.[7] Although Suzuki contends that the PMDA "made clear" that it was "prepared to approve" the Impella devices at the Menkai meeting, he admitted during his deposition that the PMDA did not guarantee approval at that time.

---

[7] We note that our analysis applies with equal force to any claim of entitlement that Suzuki may make to the third equity incentive (which promised 15,000 shares "when [a]pproval for [the] targeted reimbursement level of Impella [was] gained").  There is no question that this milestone had not been achieved at the time of Suzuki's dismissal.  And in all events, any argument that Suzuki was entitled to the third equity incentive by virtue of past services is underdeveloped and, thus, waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 21 -

Furthermore, Abiomed was neither on the cusp of, nor even close to, regulatory approval when Suzuki was cashiered.[8] The Menkai meeting was held in June of 2015, and Suzuki's own correspondence after that meeting acknowledged that it would be "very challenging" to achieve approval by the end of March of 2016. Suzuki cited several reasons for the anticipated delay, including the need to conduct additional tests and the fact that yet another expert panel would have to be convened. Cf. Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1125 (1st Cir. 1995) (finding benefit not due to employee where employee's "own writings" indicated that several goals necessary for "payout" would not be met). Even Suzuki's forecasts proved too generous: the uncontroverted record reflects that Abiomed, following Suzuki's dismissal, expended fifteen months of auxiliary effort — including conducting supplemental tests, submitting new data, answering regulators' questions, and meeting with physician advocates — before eventually achieving regulatory approval in September of 2016.

---

[8] Suzuki faults the district court for requiring proof that he was "on the brink" of achieving the second equity incentive. Although Suzuki mischaracterizes the district court's opinion, we agree with him that the "on the brink" standard is not a necessary element of proof under the Fortune/Gram doctrine. Fortune, 364 N.E.2d at 1257. Rather, whether an employee is "on the brink" of achieving a milestone at the time of discharge is simply one relevant data point in assessing an employer's true motives. See id. In this case, though, the summary judgment record bears out the district court's conclusion that Suzuki was by no means on the brink of securing regulatory approval at the time of his ouster. See Suzuki, 2019 WL 109340, at *11.

Below, Suzuki asserted that the executive who described this additional work in Abiomed's answers to interrogatories (Greenfield) lacked personal knowledge of what had been done. This assertion falls well short of creating a genuine dispute of material fact. Greenfield answered the interrogatories on behalf of Abiomed, using information available within the company. See Fed. R. Civ. P. 33(b)(1)(B). Since Rule 33(b)(1)(B) commands such corporate officers to "furnish the information available" to the company and since the record contains no evidence to the contrary, the district court acted appropriately in treating Greenfield's answers as encompassing all relevant information and data available within Abiomed. And in any event, the executive Suzuki claims had intimate knowledge of Abiomed's activities during this period (Bolt) made it plain, both by affidavit and in his deposition, that Abiomed was forced to perform substantial additional work between June of 2015 and September of 2016.

Suzuki strives to persuade us that the second equity incentive was sufficiently related to services previously rendered because the "vast majority of the work" necessary for approval had already been completed at the time of his discharge. He grounds this effort principally on his review of Abiomed's summary of technical documents (STED), which catalogues all the tests that Abiomed conducted on the Impella, year by year. He estimates that, by the time of his firing, Abiomed had completed approximately

eighty-six percent of the tests ultimately submitted to the PMDA anent the "disposable components of the Impella application," as well as one hundred percent of the tests "submitted respecting the Impella controller."

Abiomed counters that Suzuki's analysis of the STED is inadmissible for various reasons, and Abiomed asked the district court to strike it. That court deemed it unnecessary to reach the issue of admissibility, and so do we. Even assuming the admissibility of Suzuki's analysis, it is apparent that Abiomed conducted a sizable number of new tests (twenty, by Suzuki's count) between the termination of Suzuki's employment and the obtaining of regulatory approval.

In urging us to discount the significance of this additional work, Suzuki leans heavily on the decision of the Massachusetts Appeals Court in Cataldo v. Zuckerman, 482 N.E.2d 849 (Mass. App. Ct. 1985). There, the Appeals Court was faced with a breach of contract claim by a discharged construction supervisor against his former employer (a real estate developer). See id. at 851-53. The pertinent employment agreement provided that the plaintiff would "own a portion of the [d]eveloper's [e]quity" in two specified projects and in future projects, with the developer having the right to buy back the plaintiff's interest in any project pending at the time of the plaintiff's dismissal. Id. at 851-52 (alterations in original). The Appeals Court deemed

the plaintiff's interest in future projects that had progressed "beyond the stage of a mere hope" and to which the plaintiff had devoted "a significant amount of work" a future benefit sufficiently reflective of past labors to come within the reach of the Fortune/Gram doctrine. Id. at 855-56. The court explained that although "[a]ctual realization . . . of the value of any share of the developer's equity was for the future," the plaintiff's employment agreement made pellucid that "ownership of the possibility was intended to be and was part of [the plaintiff's] day-to-day compensation for work currently being done." Id. at 855.

Suzuki attempts to draw a parallel between his circumstances and the circumstances of the Cataldo plaintiff. He says that like the latter's interest in future projects, the equity incentives described in the 2010 offer letter induced his continued efforts toward regulatory approval — an endeavor that had gone beyond the stage of a mere hope and to which he had devoted a significant amount of work.

Suzuki's reliance on Cataldo is misplaced. To begin, we think it plain that the SJC would cabin Cataldo's reach. In its only decision addressing the case, the SJC deemed Cataldo "easily distinguishable" in the Fortune/Gram context. Harrison, 744 N.E.2d at 630. Following the SJC's lead, we find Cataldo readily distinguishable from the case at hand. Whereas the employment

agreement in Cataldo granted an ownership interest in equity associated with future projects, leaving open only what the exact value of that interest would ultimately be, see Cataldo, 482 N.E.2d at 851 & n.4, the employment arrangement here gave Suzuki a future right to equity incentive awards only if the associated milestones were achieved during his active employment. Thus, unlike in Cataldo, "ownership of the possibility" of attaining the equity incentives did not comprise part of Suzuki's "day-to-day compensation" such that the second equity incentive could be regarded as reflective of services that Suzuki already had rendered. Id. at 855.

We do not gainsay that Suzuki helped lay some of the groundwork for eventual approval of the Impella devices during his five-year tenure with Abiomed. But under the specific terms of the compensation arrangement entered into by the parties, Suzuki was not entitled to the second equity incentive until regulatory approval actually occurred. Given the factual mosaic that existed at the time of Suzuki's discharge, this milestone had not been achieved. Indeed, it was uncertain at that time whether it would be achieved — and, in fact, it was only achieved after fifteen months of substantial additional work. Consequently, there is no principled way in which we can say that Abiomed deprived Suzuki of "compensation clearly connected to work already performed." Cochran, 328 F.3d at 8; see King v. Mannesmann Tally Corp., 847

F.2d 907, 908 (1st Cir. 1988) (per curiam) (finding commissions contingent on events that "did not occur until months after the appellant's discharge and subsequent to a long period of negotiation . . . insufficiently reflective" of past work). And because the second equity incentive does not constitute "compensation earned but not yet paid, we need not determine whether his termination occurred in bad faith" or without good cause.[9] Harrison, 744 N.E.2d at 631.

To cinch the matter, Suzuki attempted to add a provision to the 2010 offer letter that would have entitled him to an equity incentive if a relevant milestone was achieved within six months after the termination of his employment, but Abiomed rejected such an amendment. And even if Suzuki's proposed amendment had been adopted, he still would not have been entitled to the second equity award since approval of the Impella devices occurred well over six months after his discharge. At any rate, both Suzuki's e-mail to a former colleague in May of 2015 and his deposition testimony

---

[9] Because we do not explore the motives behind the termination of Suzuki's employment, we have no need to address his contention that courts are forbidden from assessing post-termination events when inquiring into whether an employer dismissed an employee in bad faith or without good cause. For the sake of completeness, though, we add that to the extent Suzuki contends that courts may not examine post-termination events when analyzing whether compensation is sufficiently reflective of past work, he is mistaken. See King, 847 F.2d at 908 (exploring post-termination events to evaluate whether plaintiff was deprived of compensation based on past services).

reveal his crystal-clear understanding that he was not entitled to the second equity incentive unless and until he secured regulatory approval. Viewed against the backdrop of these undisputed facts, we think that Suzuki's invocation of the implied covenant for the forbidden purpose of supplying contract "terms that the parties were free to negotiate, but did not" cannot stand. Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007); see Maddaloni, 438 N.E.2d at 356 (noting that, under the Fortune/Gram doctrine, a plaintiff is not "entitled to benefits which he neither contemplated nor included in his contract").

To say more would be supererogatory. On this record, no reasonable factfinder could conclude that when Abiomed fired Suzuki, it deprived him of compensation that he had already earned by virtue of his past services. The undisputed facts establish that Suzuki understood he would be entitled to the 20,000 shares only upon final regulatory approval of the Impella devices — a milestone that was far from assured at the time of his ouster and that was not reached until fifteen months later (after much additional work). Suzuki cannot recover under the Fortune/Gram doctrine, and the district court did not err in entering summary judgment in Abiomed's favor.[10]

---

[10] We add a coda. Suzuki also suggests that he may be entitled to proportional damages (that is, a proportionate share of the second equity incentive) commensurate with the value of his efforts toward securing regulatory approval. Yet he has identified nothing

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed.**

---

in the parties' contractual arrangement that would support such an award.  Nor has he cited any persuasive Massachusetts authority that would entitle him to damages notwithstanding his failure to adduce evidence sufficient to withstand summary judgment under the Fortune/Gram line of cases.  We therefore reject this aspirational suggestion out of hand.