# United States Court of Appeals
## For the First Circuit

No. 22-1141

FINSIGHT I LP,

Plaintiff, Appellant,

v.

ROBERT SEAVER and JAMES TOGA,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Selya, and Howard,
Circuit Judges.

Israel F. Piedra, with whom Welts, White & Fontaine, P.C.,
Steven C. Reingold, Bridgitte E. Mott, and Saul Ewing Arnstein &
Lehr LLP were on brief, for appellant.
Robert L. Kirby, Jr., with whom Scott M. Zanolli and Pierce
& Mandell, P.C. were on brief, for appellees.

October 4, 2022

**SELYA**, **Circuit Judge**. This case stands for a simple proposition: when the clear text of a contractual provision gives a party the right to terminate, that party may terminate according to the provision's terms. Concluding, as we do, that defendants-appellees Robert Seaver and James Toga properly exercised their contractual right of termination, we affirm the district court's entry of summary judgment in their favor.

## I

We briefly rehearse the relevant facts and travel of the case, arraying those facts in the light most favorable to the nonmoving party (here, plaintiff-appellant FinSight I LP). See Suzuki v. Abiomed, Inc., 943 F.3d 555, 557 (1st Cir. 2019); Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 852 (1st Cir. 2016).

FinSight wished to purchase shares of stock in Unity Technologies, Inc. (Unity). The defendants wished to sell some of their Unity shares. Striving to achieve a meeting of the minds, the defendants' broker, Prabjeet Rattan, effected an email introduction of the parties. In due course, FinSight agreed to purchase 50,000 shares of Unity stock (25,000 from each defendant) for $29 per share.

To facilitate the sale, FinSight and the defendants negotiated the terms of a stock transfer agreement (the STA) through an exchange of emails. The defendants successfully negotiated for the inclusion of a termination clause, which

- 2 -

provided in part that "[i]f the Closing has not taken place within 7 business days of the date specified above, other than due to a breach of this Agreement by Transferor, Transferor shall have the right to terminate this Agreement immediately via email without further notice to Transferee." The closing of the transaction was subject to the condition that Unity approve the stock transfers "on the terms and conditions hereof."

The STA was dated June 11, 2020; it was signed by the defendants on June 12; and it was signed by FinSight on June 15. Nobody transmitted the STA to Unity for a signature at that time, although there was a space in the signature block for Unity to sign.

Seaver emailed Unity on June 16, seeking its approval of the transfers. Rattan followed up in the same email thread on June 17 and again on June 29, attaching the signed STA both times but not asking Unity to sign it either time. Unity conditionally approved the transfers on July 20 but required the transfers to be governed by its "own form of transfer agreement" (instead of the STA). Unity submitted its preferred form of transfer agreement — the secondary stock purchase agreement — to FinSight on July 29.[1]

---

[1] In point of fact, Unity sent FinSight two separate but identical agreements, one for Seaver's stock and one for Toga's stock. For ease in exposition, we refer to these agreements together as "the SSPA."

FinSight forwarded it to the defendants for their signatures on July 29.

In the intervening time, the price of Unity stock had soared. The defendants did not sign the SSPA. Instead — on August 2 — Seaver responded to FinSight's email (forwarding the SSPA), stating "[w]e'll need to review the agreement and get legal review also. However, the price has moved up considerably during the delay. . . . I wouldn't be interested in proceeding with the deal at the old price." The next day, Seaver replied to a separate email thread that "I think we're going to have to pass on moving forward with this." Konstantin Deykalo, a member of FinSight's transactions team, responded, insisting that attempting to secure a deal at a higher price risked losing Unity's approval; that any higher price quoted by another broker was not secure; and that FinSight considered the STA to be binding and would seek reimbursement for the time and money it had invested in the deal if the defendants welched.

On August 4, Seaver responded by terminating the STA pursuant to the termination clause "to the extent [the STA] was ever in effect." Four days later — in response to a letter from FinSight — Seaver asserted that the defendants had properly exercised their right to terminate and that, "[i]n any case, Unity said they would not permit the sale based on [the STA]." The SSPA, he added, had "different terms" from the STA.

FinSight did not walk away quietly from the ruins of the deal. Instead, it sued the defendants in the United States District Court for the District of Massachusetts, alleging breach of contract and other related causes of action. Federal jurisdiction was based on diversity of citizenship and the existence of a controversy in the requisite amount. See 28 U.S.C. § 1332(a). After the close of discovery, the defendants moved for summary judgment. See Fed. R. Civ. P. 56(a). FinSight opposed the motion.

The district court granted the defendants' motion and entered summary judgment in their favor. The court concluded, among other things, that no enforceable contract had been formed and that, even if the STA constituted an enforceable contract, the defendants had properly exercised their termination right. See FinSight I LP v. Seaver, 2022 WL 407423, at *2-3 (D. Mass. Feb. 10, 2022). This timely appeal followed.

**II**

We review the district court's entry of summary judgment de novo. See Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC, 16 F.4th 304, 308 (1st Cir. 2021). In conducting this tamisage, "we take the facts in the light most hospitable to the nonmovant . . . and draw all reasonable inferences therefrom to that party's behoof." Id.; see Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d 33, 37 (1st Cir. 2015). We will affirm "when

- 5 -

the record, read in this way, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Alston v. Int'l Ass'n of Firefighters, Local 950, 998 F.3d 11, 24 (1st Cir. 2021) (citing Fed. R. Civ. P. 56(a)). Such an affirmance may rest on any ground supported by the record. See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

Because this case arises in diversity jurisdiction, we look to federal law for the summary judgment framework and to state law for the substantive rules of decision. See Esoterix, 16 F.4th at 308. As to which state is implicated in this formulation, FinSight suggests that we apply either Massachusetts or Delaware law and tells us that there is no substantive difference between the two as to the questions of contract formation and breach that are implicated here. The defendants are less explicit, but they cite primarily to Delaware cases. As there is no real dispute between the parties on this point, we will accept Delaware law as furnishing the substantive rules of decision without performing a full choice-of-law analysis. Cf. Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (explaining that when "the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement").

We divide our analysis into three segments. First, we interpret the text of the termination clause and the bounds of the right granted by that clause. Next, we assess FinSight's claims based on the STA. Finally, we address FinSight's equitable claims.

**A**

FinSight first contends that the district court erred in concluding that there was no genuine dispute of material fact as to whether the parties entered into an enforceable agreement. We do not need to reach this issue, though, because the district court's alternative holding is dispositive here: even if we assume (favorably to FinSight) that the STA was an enforceable contract, the defendants properly terminated it. Our reasoning follows.

Under Delaware law, the interpretation of a contract is a question of law for the court. See Paul v. Deloitte & Touche, LLP, 974 A.2d 140, 145 (Del. 2009). To determine the correct interpretation of a contract, we give priority to the intention of the contracting parties, looking first to the text of the contract "to conclude whether the intent of the parties can be determined from its express language." Id. In interpreting the text, "[c]lear and unambiguous language . . . should be given its ordinary and usual meaning." Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006) (second alteration in original) (quoting Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992)). "When the language of

a . . . contract is clear and unequivocal, a party will be bound by its plain meaning . . . ." Id. (first alteration in original) (quoting Rhone-Poulenc, 616 A.2d at 1195-96). Thus, we will look outside the margins of the contractual text for evidence of the contract's meaning only when the text is ambiguous. See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997).

### 1

In resolving the question of whether the defendants properly exercised their right to terminate under the STA, we begin with the language of the termination clause itself. In its entirety, that clause reads:

> Subject to satisfying of Conditions Precedents (as provided in clause 3 hereof), the closing of the sale and purchase of the Transferred Shares shall take place at 10:00 a.m. California time on the date hereof (the "Closing") or as soon as reasonably practicable following satisfaction or waiver (by the applicable party) of the conditions set forth in this Section 2 (other than conditions which can on their terms be satisfied only at Closing), or at such other time or place as the parties may mutually agree. The Closing shall take place remotely via the exchange of documents, electronically or otherwise. If the Closing has not taken place within 7 business days of the date specified above, other than due to a breach of this Agreement by Transferor, Transferor shall have the right to terminate this Agreement immediately via email without further notice to Transferee.

As an initial matter, the parties do not dispute in this court that "the date specified above" refers to the STA's execution date. They disagree, however, as to whether the execution date is June 11 (the date inscribed in the contract itself) or June 15 (the date on which the last of the parties — FinSight — signed the STA). Taking the facts in the light most favorable to the nonmoving party — as we are required to do — we assume that the date of execution is June 15.

With that assumed fact in place, the termination clause, stripped to bare essence, provides unambiguously that if the closing does not take place within seven business days of June 15 and the delay is not due to a breach by the defendants, the defendants will have an unqualified right to terminate the STA forthwith. What is more, the undisputed facts show that the defendants properly exercised this right: the transaction did not close within seven business days next following the execution date, and the defendants gave their notice of termination subsequent to the expiration of that period.

FinSight demurs. It asserts that we should interpret the text of the termination clause to provide that the defendants lose their termination right if they breach the contract at any time, not just if they commit a breach within the seven days. But this assertion is decisively rebutted by the plain language of the termination clause itself. That clause states that the defendants

may terminate if the closing "has not taken place within 7 business days of the [execution] date . . . , other than due to a breach of this Agreement by [the defendants]." The phrase "other than" indicates that the potential breach contemplated by the termination clause is a restriction on the accrual of the termination right, not a requirement that applies after the right has vested. See 2 Oxford English Dictionary 962 (2d ed. 1989) (defining "other than" as "besides, except, apart from"). The termination clause thus clearly states that the defendants had the right to terminate the STA if the closing did not take place within seven business days of the execution date, unless that delay was attributable to their breach.

Even if we found the text to be ambiguous — and we do not — the undisputed evidence shows that the defendants specifically negotiated for the seven-day termination clause because they did not want to be "tied up indefinitely" while the stock price was subject to fluctuation. The defendants even offered to delay execution if FinSight believed it could not satisfy the conditions within the seven-day window. FinSight could have balked at including such a termination clause in the contract, negotiated for either a longer period of time or a clause embroidered with more contingencies, or gotten its ducks in a row before executing the STA. FinSight did none of these things. The undisputed evidence supports the plain reading of the text: the

defendants' termination right vested, as the parties intended, after seven business days.

Here, moreover, it is uncontroverted that the defendants did nothing in the seven business days following June 15 either to breach the STA or to undermine the closing of the deal. The defendants sought to carry out the conditions of the contract within that time span. Seaver emailed Unity on June 16 seeking its approval to transfer the defendants' shares, pursuant to the STA's requirement that Unity approve the transfer prior to the closing. Unity did not respond to that email or subsequent emails from the defendants' broker until June 29, well after seven business days had elapsed. The fact that the deal did not close within seven business days of June 15 was not "due to a breach of th[e] Agreement by [the defendants]" but, rather, due to Unity's foot-dragging. Consequently, the defendants' right to terminate vested at the expiration of seven business days. And the defendants thereafter exercised that right as they were entitled to do.

**2**

In an effort to change the trajectory of the debate, FinSight mounts a flanking attack. It contends that — even if the STA gave the defendants a right to terminate that vested after seven days — the defendants could not properly exercise that right. FinSight raises this argument in two, slightly different,

iterations. First, it claims that once the conditions precedent were satisfied, performance was required under the contract and the termination right vanished. Second, it claims that the defendants acted in bad faith and breached the STA based on their purported reasons for terminating the contract. In analyzing these claims, we assume — albeit without deciding — that Unity's approval was provided on terms and conditions materially equivalent to those set forth in the STA, such that the condition of its approval was satisfied.

As to the first argument, we understand FinSight to mean that the defendants' termination right went up in a puff of smoke once Unity approved the transfer and the STA's conditions precedent were satisfied. We see the logic behind FinSight's argument insofar as the power to terminate operates "prospectively" to discharge only a party's "contractual duty to perform promises that are still wholly executory." 13 Sarah Howard Jenkins, Corbin on Contracts § 68.9, at 250 (Joseph M. Perillo rev. ed. 2003). It follows that there may be nothing to terminate if no promises remain to be performed.

But this is not such a case. There is simply no basis in the text of the STA for concluding that once the conditions precedent were satisfied, the contract was completed such that the termination right vanished or that the failure to transfer shares constituted an immediate breach.

We must look to the text of the contract to determine what obligations it places on the parties. See VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003) (explaining that a breach of contract requires "the breach of an obligation imposed by that contract"); see also Airborne Health, Inc. v. Squid Soap, LP, 984 A.2d 126, 145 (Del. Ch. 2009) (concluding no breach of contract where contract provisions did not by their terms impose those obligations on defendant which plaintiffs sought to enforce). In support of its argument that the defendants lost their termination right once Unity approved the deal, FinSight points to language in the termination clause decreeing that the closing "shall take place . . . on the date hereof . . . or as soon as reasonably practicable following the satisfaction or waiver" of the conditions precedent. This mandatory language, FinSight argues, left no choice for the defendants but to transfer their shares or commit a breach.

There is simply no principled basis for concluding that all the obligations under the contract were fulfilled at that point. After all, the parties had not yet transferred the shares or the money. And there is no reason to read the cited language as affecting the termination right: that section of the paragraph refers to the effect of conditions on the closing, not the termination right. If those conditions had been satisfied within the seven-day period before the termination right vested, the

defendants may well have had an obligation to close "as soon as reasonably practicable." But nothing in the text supports an inference that the completion of the conditions precedent would subvert the termination right that already had vested.[2]

We turn to the second version of FinSight's argument. FinSight claims that the defendants violated an implied covenant of good faith and fair dealing by asserting in bad faith that the basis for their termination was the SSPA's materially different terms and by endeavoring to "kill the deal" by asking Unity to withdraw its support. But this argument muddles the order of events: by the time that the defendants asserted that the terms of the STA and SSPA were materially different and reached out to Unity to ask it to revoke its support, they already had terminated the deal. Their actions after that point are immaterial.

Next, FinSight directs us to Section 5.7 of the STA, entitled "Company Information," in which the defendants "[gave] up the opportunity to sell the Transferred Shares at a possible higher price in the future," as evidence that the defendants breached the

---

[2] Along the same lines, we reject FinSight's attempted reliance on the "further assurances" clause of the STA, which provides that "[t]he parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement." FinSight reads that clause to create an obligation for the defendants to renegotiate the terms of the SSPA if it contained material differences from the STA. But there is nothing in the further assurances clause that suggests that it operates as a restriction on the defendants once that termination right has vested.

STA and acted in bad faith before they invoked the termination clause. Noting that Seaver wrote on August 2 that he "wouldn't be interested in proceeding with the deal at the old price," FinSight suggests that the defendants both breached Section 5.7 and operated in bad faith when they later cited the differences between the STA and the SSPA as a reason for their exercise of the termination right.

It is black letter law that contract provisions must be read as a whole, taking context into account. See, e.g., New Castle Cnty. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 174 F.3d 338, 349 (3d Cir. 1999) (explaining that a "single clause or paragraph of a contract cannot be read in isolation, but must be read in context" (quoting Cheseroni v. Nationwide Mut. Ins. Co., 402 A.2d 1215, 1217 (Del. 1979))).

Read as a whole, Section 5.7 is obviously meant to state and delimit the full extent of the defendants' relevant knowledge about the company. Nothing in Section 5.7 suggests that its final line is intended to be read as a hidden circumscription of the power to terminate, such that termination would be allowed for any reason except a rise in the market price. We will not assume, without more, that the purpose of a separate provision discussing "Company Information" is to imply such a restriction.

And here, there is no "more." The termination clause included only two restrictions: that it could not be exercised

for seven business days after the date of execution and that it could not be exercised thereafter if the delay was caused by the defendants' breach. The parties specifically negotiated the termination clause and could have incorporated further restrictions in it. They did not. Our obligation, then, is to enforce the termination clause that the parties wrote into the contract, not to enforce hypothetical termination provisions that they might have written. See Gilbert v. El Paso Co., 490 A.2d 1050, 1055 (Del. Ch. 1984), aff'd, 575 A.2d 1131 (Del. 1990) (explaining that, in the context of a termination clause, when "the conditions are expressed, the motivation of the invoking party is, in the absence of fraud, of little relevance"). Under the terms of the STA, any subsequent discussions of the defendants' reasons for terminating were irrelevant to the question of whether they had properly exercised their right of termination in the first place.

**3**

We turn next to the final version of FinSight's argument as to whether a breach preceded the defendants' invocation of their termination right. In this variant, FinSight maintains that an action for breach lies even if the defendants properly exercised their termination right — as we have concluded they did.

This argument is past its expiration date. FinSight did not make this argument below. Even in this court, FinSight

- 16 -

squarely presented the argument for the first time in its reply brief. As such, we deem the argument doubly waived. See Teamsters, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."); Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990) (explaining that because argument was not made "in appellant's opening brief, surfacing only in his reply brief, it has been waived").

That ends this aspect of the matter. Even assuming that the parties were bound by an enforceable contract, FinSight cannot escape the terms of that contract. The termination right is clearly stated, and the defendants properly exercised it.

**B**

FinSight proposes two alternative theories of recovery, neither of which sounds in breach of contract. First, it alleges that the defendants are liable under a theory of promissory estoppel. Second, it alleges that the defendants are liable for unjust enrichment. We address these plaints separately.

**1**

To succeed on a claim for promissory estoppel, FinSight "must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." Lord v. Souder, 748 A.2d 393, 399 (Del. 2000). "The prevention of injustice is the 'fundamental idea' underlying the doctrine of promissory estoppel." Chrysler Corp. (Del.) v. Chaplake Holdings, Ltd., 822 A.2d 1024, 1034 (Del. 2003) (quoting Chrysler Corp. v. Quimby, 144 A.2d 123, 133 (Del. 1958)). Recovery under promissory estoppel presupposes the lack of an enforceable contract. See Chaplake Holdings, 822 A.2d at 1031.

In advancing this theory of liability, FinSight relies primarily on Ramone v. Lang, 2006 WL 4762877 (Del. Ch. Apr. 3, 2006). There, the defendant promised the plaintiff that, regardless of whether they reached an agreement in their negotiations over the joint ownership of a property (which they did not), the plaintiff could lease the property. See id. at *6-7, *14. Here, in contrast, FinSight does not allege a comparably definite promise to close the deal on which it would have been reasonable for it to rely.

FinSight claims that the substance of the STA should be enforced — even if the agreement itself is unenforceable — on the basis that the defendants negotiated the STA, were aware of FinSight's efforts to close the transaction, and pursued Unity's approval. But FinSight also claims that it believed the STA to be in effect following its June 15 signing of that document. Thus, there is no question that FinSight was aware of the defendants' termination right. It would not have been reasonable for FinSight to rely on the defendants to refrain from exercising their right to terminate under an agreement that FinSight believed to be in effect.

FinSight responds that the defendants' actions signaled their intent to waive their termination right and that, in light of that waiver, FinSight could reasonably rely on their eschewal of the termination right. In support, FinSight directs our attention to the actions of the defendants' broker, Rattan, who continued to pursue Unity's approval after the seven business days had passed and indicated that the defendants would be willing to sign a second agreement if Unity demanded it. But this is merely shouting into the wind: even if Rattan was the defendants' agent and, through him, the defendants indicated that they might be willing to wait until Unity approved the deal, those actions would not be enough for the defendants to reasonably anticipate that FinSight would rely on them as a waiver of the termination clause.

It would not have been reasonable for FinSight to assume that Rattan's indication of continued interest through occasional emails overrode the express language of the termination right. Put another way, the defendants' actions in this case could not reasonably have been expected to induce reliance, nor were those actions of such a character that the only way to avoid injustice would be to enforce the terms of the STA outside the bounds of contract law.

**2**

This leaves FinSight's claim for unjust enrichment. That claim is presented in conclusory fashion, devoid of developed argumentation. Because FinSight has failed to flesh out that claim with either law or argument, we deem it waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

**III**

We need go no further. The terms and conditions of the STA are clear and unambiguous. It says what it means and — once the seven-day window had closed — the defendants were free to exercise the termination right that the STA afforded to them. For the reasons elucidated above, the judgment of the district court is

**Affirmed**.